51 F.3d 1229
 32 Fed.R.Serv.3d 939
 CHESAPEAKE PAPER PRODUCTS COMPANY, Successor in Interest to
Chesapeake Corporation, Plaintiff-Appellee,
v.
STONE & WEBSTER ENGINEERING CORPORATION, Defendant & Third
Party Plaintiff-Appellant,
v.
TIDEWATER CONSTRUCTION CORPORATION, Third Party Defendant.
 No. 94-1617.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 6, 1994.
Decided April 19, 1995.
 
 ARGUED: Robert Joseph Kaler, Jr., Gadsby & Hannah, Boston, MA, for appellant. Edward Joseph Fuhr, Hunton & Williams, Richmond, VA, for appellee. ON BRIEF: James E. Farnham, Donald P. Boyle, Jr., Hunton & Williams, Richmond, VA, for appellee.
 Before RUSSELL and MOTZ, Circuit Judges, and CURRIE, United States District Judge for the District of South Carolina, sitting by designation.
 Affirmed by published opinion. Judge RUSSELL wrote the opinion, in which Judge MOTZ and Judge CURRIE joined.
 OPINION
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 Stone & Webster Engineering Corp. (S & W) appeals from the district court's denial of S & W's motion for partial summary judgment and motion for a new trial. We decline to review the district court's order denying S & W's summary judgment motion, and we affirm the district court's order denying S & W's motion for a new trial.
 
 I.
 
 2
 On March 2, 1993, Chesapeake Paper Products Co. (Chesapeake) filed a complaint in the Eastern District of Virginia alleging breach of contract on the part of S & W. The claim centered on an agreement under which Chesapeake retained S & W to supply engineering services in connection with a $105 million expansion of Chesapeake's West Point, Virginia, paper mill during the period of 1989 through 1992 (the Project). Chesapeake contended that S & W had breached its contract with Chesapeake by supplying Chesapeake's contractor and construction manager with engineering drawings containing errors and omissions that S & W subsequently had to correct as the Project progressed. These errors resulted in delays in scheduled work and increased costs and expenditures. Chesapeake based its claims on the allegation that the preprinted terms and conditions on the back of the Chesapeake Purchase Order No. C006097 (the P.O.) it had sent to S & W during the Project constituted the parties' contract.
 
 
 3
 S & W agreed that its engineering drawings had contained some inconsistencies but denied that those errors constituted a breach of contract, particularly when it was undisputed that the Project had been a "fast track" job where design changes were made throughout the construction process. Importantly, S & W also claimed that the parties' contract consisted not of the P.O. terms, but of the terms in its proposed "Engineering Contract" it had delivered to Chesapeake at the outset of the Project. This dispute was significant because the P.O. and the Engineering Contract differed substantially in their provisions controlling standard of care and indemnification. The P.O. provided a high standard of care in which S & W warranted that "all the materials and articles covered by this order" will be "free from defects in material and/or workmanship, and merchantable." In contrast, the Engineering Contract provided that the "Engineer shall provide detail engineering services ... conforming with good engineering practice." Similarly, the P.O. provided that S & W agreed to indemnify "all" expenses, "including reasonable counsel fees," Chesapeake might incur as a result of the agreement whereas the Engineering Contract contained no attorneys' fees provision and precluded the recovery of "consequential or special damages."
 
 
 4
 After the close of discovery, S & W moved the district court for partial summary judgment on October 22, 1993. In its motion, S & W asked the court to rule as a matter of law that the rights and liabilities of the parties were governed by the Engineering Contract, as amended on January 16-17, 1992, by "Amendment No. 1 to Contract for Engineering and Consulting Services Chesapeake Corporation" (Amendment 1). The following evidence was undisputed and was before the district court at summary judgment.
 
 
 5
 On August 8, 1989, S & W Vice-President Frank Tenore met with G. Stephen Boynton, who at the time was Project Manager for Chesapeake and had the authority to represent Chesapeake on contract issues concerning the Project. At the meeting, Tenore delivered to Boynton S & W's proposed Engineering Contract. The contract contained seventeen pages of substantive terms but included numerous blank spaces allowing for signatures and other additional terms, such as a description of the project and the name of the owner, here Chesapeake. At the meeting, Tenore also delivered to Boynton a letter, dated August 8, 1989, affirming S & W's commitment to Chesapeake and including an attachment identifying the percentage mark-ups S & W proposed to charge for compensation. On August 15, 1989, Boynton gave S & W oral notification that S & W should proceed with providing engineering services for the Project.
 
 
 6
 On August 18, 1989, Richard Bauer, S & W Project Manager, sent a letter (Project Confirmation Letter) to Chesapeake which read, in pertinent part, "Pending execution of a mutually acceptable agreement, S & W will perform our services pursuant to the terms and conditions stated in our proposed 'Engineering Contract' presented by Mr. F.M. Tenore on August 8, 1989." Boynton received the letter in August 1989 and he countersigned it on September 21, 1989. In August and September 1989, S & W began providing engineering services for the Project on a cost-plus basis.[1]
 
 
 7
 On October 18, 1989, at Boynton's request, Chesapeake sent the P.O. to S & W with the following typewritten request in the "Description" block:
 
 
 8
 PROVIDE ENGINEERING SERVICES FOR OUR WEST POINT KRAFT PRODUCTS MILL IN ACCORDANCE WITH THE TERMS AND CONDITIONS STATED IN YOUR PROPOSED "ENGINEERING CONTRACT" DATED AUGUST 8, 1989.
 
 
 9
 TERMS OF COMPENSATION TO BE IN ACCORDANCE WITH THE AUGUST 8, 1989 LETTER.
 
 
 10
 The pre-printed portion of the P.O. also contained language in smaller print on the lower left portion of the front side stating:
 
 
 11
 THIS ORDER MAY BE ACCEPTED ONLY UPON THE TERMS AND CONDITIONS SPECIFIED ABOVE AND ON THE REVERSE SIDE. SHIPMENT OF GOODS DESCRIBED HEREIN SHALL BE DEEMED TO BE AN ACCEPTANCE BY SELLER OF SUCH TERMS AND CONDITIONS.
 
 
 12
 The P.O. included, on the back, seventeen paragraphs of preprinted "terms and conditions." In deposition, Boynton testified that he intended the P.O.'s reference to the "Engineering Contract" to pertain to S & W's August 8 commitment letter and the attached schedule of billing rates. In deposition, Tenore stated that he did not notice or pay attention to the preprinted language on the P.O. S & W did not countersign the P.O., but S & W continued to work on the Project and it admitted that it did not send any writing to Chesapeake expressly rejecting the terms and conditions of the P.O.
 
 
 13
 In December 1989, Tenore's assistant received an internal memorandum from one of S & W's contract staff suggesting that Tenore forward to Chesapeake a signed copy of the Engineering Contract for execution. Tenore followed this suggestion and in December 1989 sent Boynton two copies of the Engineering Contract, which were backdated to August 22, 1989, and were signed by S & W. S & W also filled in the blanks of these copies of the Engineering Contract with the names of the parties and other important information, including a one million dollar limitation on S & W's liability. Tenore attached a cover letter, which stated, in part:
 
 
 14
 Based on our current understandings and project efforts, [S & W] is pleased to submit the attached Engineering Contract under which our present activities are being performed. We have completed the draft contract previously presented to you by filling in the blank spaces contained in the draft with what we believe to be the appropriate or correct information. For administrative reasons, we request that you review this contract, and sign and return a copy for our files.
 
 
 15
 Chesapeake did not respond to this letter and did not execute the completed version of the Engineering Contract.[2]
 
 
 16
 Beginning on July 12, 1990, Chesapeake sent a series of additional purchase orders to S & W for additional work. Three of these orders contained the same language as the original P.O.:
 
 
 17
 TERMS & CONDITIONS TO BE IN ACCORDANCE WITH YOUR PROPOSED "ENGINEERING CONTRACT" DATED AUGUST 8, 1989.
 
 
 18
 A fourth purchase order stated only that "All other terms and conditions to remain the same." All of these additional purchase orders contained the same preprinted language and terms and conditions that were on the original P.O., but none of these additional orders was countersigned by S & W.
 
 
 19
 On September 20, 1990, Bauer demonstrated his familiarity with the P.O. terms and conditions by writing a letter to Boynton suggesting revisions to the P.O. warranty and indemnification provisions in dealing with future vendors on the Project. On September 24, 1991, Bauer, who was still Project Manager at the time,[3] also sent an internal memorandum to Jean McCluskey, an S & W Vice-President, in which he acknowledged that Chesapeake had not responded to S & W's sending of the completed Engineering Contract in December 1989. Bauer wrote:
 
 
 20
 The only scope of work document we had is attached. This was forwarded for Chesapeake review in December 1989. It was never returned even though we inquired several times about it....
 
 
 21
 Chesapeake preferred to work with consultants based upon purchase order terms and conditions. You have a copy of this and the proposed basis of compensation. The basis is also attached to the sample contract here as exhibit I.
 
 
 22
 On January 16 and 17, 1992, the parties executed Amendment 1. On its face, Amendment 1 modified "the Agreement for Engineering and Consulting Services as referenced in Owner's Purchase Order C006097." Although the "Engineering and Consulting Services" terminology was included on the unexecuted December 1989 contract and not on the original Engineering Contract, Amendment 1 expressly modified "Article IV-Payment to Engineer" and "Article VII Payment," which were sections of the original and the completed Engineering Contract. The amendment specifically set a cap on the fees S & W could bill Chesapeake and deferred Chesapeake's payment of its final payment installation to S & W until the Project was completed. After delineating the modifications, Amendment 1 stated that "All other terms and conditions of the original Agreement remain unchanged." Chesapeake sent S & W no purchase orders after the execution of Amendment 1.
 
 
 23
 After considering the above evidence, the district court denied S & W's motion for partial summary judgment by an order dated November 16, 1993. The court found that there were ambiguities in the competing contract documentation presented by the parties and that these ambiguities presented "genuine issues of material fact regarding the formation of the contract and ultimately the proper interpretation of what one finds to be the contract between the parties." Joint Appendix (J.A.) 302.
 
 
 24
 On December 1, 1993, a seven-day jury trial began in which fourteen witnesses testified and the parties introduced more than 1,000 exhibits, approximately 68 of which addressed the contract issue. Along with some additional testimonial evidence, the jury considered the same documents and facts the district court had reviewed at summary judgment.
 
 
 25
 In his testimony at trial, Tenore stated that Amendment 1 expressly modified the original Engineering Contract submitted to Chesapeake on August 8, 1989. Chesapeake's counsel challenged Tenore on cross examination to explain why he had not written to Chesapeake specifically rejecting the P.O. terms and conditions and why he had subsequently in December 1989 sent a signed, completed copy of the Engineering Contract to Chesapeake. He responded that he did not pay attention to the preprinted language at the bottom of the P.O. because he was satisfied that the P.O. clearly requested S & W to proceed under its Engineering Contract, as agreed in the August 18, 1989, Project Confirmation Letter. Tenore also stated that he sent a signed, completed copy of the Engineering Contract to Chesapeake to pursue the formal execution of a "mutually agreeable" contract document as contemplated in the Project Confirmation Letter. Tenore added that he sent Chesapeake another letter on November 20, 1990, in which he proposed a deferred compensation schedule and again attempted to have Chesapeake affirm the December 1989 completed contract. He stated that Chesapeake neither signed nor agreed to the terms in the completed Engineering Contract.
 
 
 26
 At trial, Boynton also provided additional testimony that had not been part of the summary judgment record. In pertinent part, Boynton stated that the Project Confirmation Letter incorporating the Engineering Contract was not intended to be a "permanent agreement." Boynton further stated that Chesapeake generally uses its purchase order form in contracting with other parties. He added that "I don't recall that Mr. Bauer had any objections to the way we wanted to do our business" when he told Bauer in their meeting in September 1989 that Chesapeake intended its purchase order to govern the agreement between the parties.[4] Finally, Boynton's statement in deposition that he intended the P.O.'s reference to the "Engineering Contract" to pertain to S & W's August 8, 1989, commitment letter and attached schedule of billing rates was supported when S & W produced at trial the original P.O. from its contract file, with the August 8 letter and the rates schedule still attached. The Engineering Contract was included in S & W's contract file but was not attached to the P.O.
 
 
 27
 S & W and Chesapeake agreed at trial that their operative contract constituted either the original Engineering Contract or the P.O., both as amended by Amendment 1. At the end of the Chesapeake's case, S & W moved for judgment as a matter of law on Chesapeake's claim, but the district court denied the motion. At the close of all the evidence, the court instructed the jury to determine whether the original Engineering Contract or the P.O. governed the parties' agreement. On December 9, 1993, the jury found that the parties' "operative contract" was the P.O., as amended by Amendment 1, and that S & W had breached that contract. The jury awarded Chesapeake $4,665,642 in damages. On December 30, 1993, S & W moved for a new trial pursuant to Fed.R.Civ.P. 59(a)(1). The district court denied the motion on April 12, 1994. S & W now appeals that decision and the court's denial of S & W's motion for partial summary judgment.
 
 II.
 
 28
 We first address S & W's claim seeking review of the district court's order denying S & W's motion for partial summary judgment. Chesapeake argues that this Court should not review, under any standard, the district court's denial of S & W's motion because the case proceeded to a full trial on the merits. To support its argument, Chesapeake notes that eight federal circuits have recently adopted the rule that the denial of summary judgment is not reviewable on appeal after a full trial and final judgment on the merits of the case.[5] Watson v. Amedco Steel, Inc., 29 F.3d 274, 277-78 (7th Cir.1994); Black v. J.I. Case Co., 22 F.3d 568, 570-72 (5th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 579, 130 L.Ed.2d 494 (1994); Johnson Int'l Co. v. Jackson Nat'l Life Ins. Co., 19 F.3d 431, 434 (8th Cir.1994); Lama v. Borras, 16 F.3d 473, 476 n. 5 (1st Cir.1994); Whalen v. Unit Rig, Inc., 974 F.2d 1248, 1250-51 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1417, 122 L.Ed.2d 787 (1993); Jarrett v. Epperly, 896 F.2d 1013, 1016 (6th Cir.1990); Locricchio v. Legal Servs. Corp., 833 F.2d 1352, 1358-59 (9th Cir.1987); Glaros v. H.H. Robertson Co., 797 F.2d 1564, 1573 & n. 14 (Fed.Cir.1986), cert. dismissed, 479 U.S. 1072, 107 S.Ct. 1262, 94 L.Ed.2d 124 (1987). In addition to these eight circuits, the Eleventh Circuit has held that review is not available after a full trial if the party seeking review admits either that the evidence produced by the party who opposed summary judgment was sufficient by the time of trial to be presented to the jury or that the evidence at trial had been altered from the pretrial record in some manner favorable to the opposing party. Holley v. Northrop Worldwide Aircraft Servs., Inc., 835 F.2d 1375, 1377-78 (11th Cir.1988).
 
 
 29
 This Court has reviewed the district court's denial of summary judgment after a full trial on the merits in three cases decided prior to these holdings from other circuits.[6] Gill v. Rollins Protective Servs. Co., 773 F.2d 592, 596-97 (4th Cir.1985) (affirming district court's denial of summary judgment), amended on other grounds, 788 F.2d 1042 (4th Cir.1986); Orlandi v. Goodell, 760 F.2d 78, 80-82 (4th Cir.1985) (reversing district court's denial of summary judgment); Smith v. University of N.C., 632 F.2d 316, 338 (4th Cir.1980) (affirming district court's denial of summary judgment). Importantly, however, in none of these decisions did the court take special notice of the fact that it was reviewing the district court's pretrial summary judgment decision after a full trial on the merits. Instead, the court in Smith and Gill simply proceeded to state the traditional de novo standard of review that a reviewing court applies in addressing an appeal of a district court's summary judgment decision. See Gill, 773 F.2d at 595 ("In reviewing the district court's denial of a motion for summary judgment, the court must apply the same standards that guided the district court in making its original decision on that motion."); Smith, 632 F.2d at 338 ("The standards governing the review of a denial of summary judgment are identical to those guiding the original decision whether the motion should be granted."). Although the Orlandi decision did not specifically recite any standard of review, the court's reasoning clearly implies that the court similarly reviewed de novo the district court's denial of summary judgment. See Orlandi, 760 F.2d at 80-81 & n. 2. Because these opinions did not address the issue, we proceed in this case to consider whether this Court should review the denial of summary judgment after a full trial on the merits.
 
 
 30
 In arguing that this Court should apply de novo review to the district court's decision, S & W contends that the decisions from other circuits denying review are distinguishable from this case because they involved appeals from the denial of summary judgment motions seeking outright dismissal of entire causes of action based on insufficient evidence. In this case, S & W's summary judgment motion did not seek dismissal of Chesapeake's entire breach of contract claim but sought partial summary judgment to obtain judicial determination of whether the terms and conditions of the Engineering Contract or the P.O. governed the rights and liabilities of the parties. S & W argues that summary judgment denials of such discrete legal issues are and should be reviewable after trial, especially because such issues cannot support a judgment as a matter of law dismissing the opponent's entire claim.[7]
 
 
 31
 In effect, S & W's argument advocates a dual approach in which this Court would review denials of summary judgment after a full trial when the party seeking review alleges that the district court made an erroneous legal conclusion, such as applying an incorrect legal standard, but not when the party seeking review alleges that the court made an erroneous factual determination.[8] We reject the contention that our review should depend on whether the party claims an error of law or an error of fact. Such a dichotomy is problematic because all summary judgment decisions are legal decisions in that they do not rest on disputed facts. See Black, 22 F.3d at 571 n. 5. The legal nature of summary judgment decisions is evident from our traditional de novo standard for reviewing such decisions. See, e.g., Haavistola v. Community Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214 (4th Cir.1993). Furthermore, such a dichotomy would require this Court to engage in the dubious undertaking of determining the bases on which summary judgment is denied and whether those bases are "legal" or "factual." See Wells v. Hico Indep. Sch. Dist., 736 F.2d 243, 251 n. 9 (5th Cir.1984) (declining to review denial of summary judgment after full trial on the arguably "legal" issue of whether claimants had property interest in their teaching positions), cert. dismissed, 473 U.S. 901, 106 S.Ct. 11, 87 L.Ed.2d 672 (1985). The Federal Rules of Civil Procedure do not require such a dichotomy in summary judgment denials, see Fed.R.Civ.P. 56(c), and we decline to create a new jurisprudence in which district courts would be obliged to anticipate parties' arguments on appeal by bifurcating the legal standards and factual conclusions supporting their decisions denying summary judgment. See Black, 22 F.3d at 571 n. 5 (similarly declining to create a legal/factual dichotomy in reviewing denials of summary judgment after a full trial).
 
 
 32
 The problems surrounding the creation of such a legal/factual dichotomy are apparent in this case. Specifically, S & W claims that its motion sought partial summary judgment on a discrete legal issue, but in actuality, its motion sought resolution of the conflicting factual inferences from the competing contract documentation on the central issue of which document governed the rights and liabilities of the parties. The importance of factual determinations in this decision are evident in the district court's oral decision denying the motion, in which the court reasoned that "there are clearly genuine issues of material fact regarding the formation of the contract." J.A. 302.[9] This Court has similarly recognized that disputes over contract formation and interpretation inevitably involve important factual inquiries:
 
 
 33
 While there may of course be situations in which the manifestations of intention of both parties to be bound, or of either not to be bound, are so unequivocal as to present no genuine issue of fact, this will but rarely be so in protracted negotiations involving a "jumble of letters, telegrams, acts, and spoken words." Restatement (Second) of Contracts, ... Sec. 21A, Comment a. Ordinarily in such cases, the issue whether there has at any time been the requisite manifestation of mutual assent to a bargained exchange will be one of fact in genuine dispute so as to preclude summary judgment.
 
 
 34
 Charbonnages de France v. Smith, 597 F.2d 406, 415 (4th Cir.1979).
 
 
 35
 As the district court concluded in this case, such a factual resolution is an appropriate task for the finder of fact after a trial on the merits. Reviewing a pretrial denial of summary judgment after a full trial is inappropriate because the denial was based on an undeveloped, incomplete record, which was superseded by evidence adduced at trial.[10] See Lama, 16 F.3d at 476 n. 5. Even when the pretrial record and the trial testimony are identical, a judgment after a full trial is superior to a pretrial decision because the factfinder's verdict depends on credibility assessments that a pretrial paper record simply cannot allow. See Johnson, 19 F.3d at 435. As the Fifth Circuit reasoned, "It makes no sense whatever to reverse a judgment on the verdict where the trial evidence was sufficient merely because at summary judgment it was not." Black, 22 F.3d at 572. Reviewing the district court's decision after a full trial is also problematic because in denying a summary judgment motion, the district court "does not settle or even tentatively decide anything about the merits of the claim"; its denial "decides only one thing--that the case should go to trial." Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc., 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966), quoted in Watson, 29 F.3d at 277.
 
 
 36
 Most importantly, bifurcating summary judgment decisions based on law and fact is unnecessary because a party that believes the district court committed legal or factual error in denying summary judgment has adequate remedies other than seeking review of the denial after a full trial. First, a party may move for judgment as a matter of law under Fed.R.Civ.P. 50 and then seek appellate review of the motions if they are denied. See Watson, 29 F.3d at 279 (holding that an appellate review of Rule 50 motions is an adequate remedy for erroneous denials of summary judgment); Whalen, 974 F.2d at 1251 (same). S & W moved for judgment as a matter of law during the trial, but it did not renew its motion after the jury verdict pursuant to Rule 50(b). Contrary to S & W's characterization, a party may appropriately move for judgment as a matter of law on discrete legal issues, such as the contract issue in this case, because a party may seek such judgments with respect to issues that are not wholly dispositive of a claim or defense. See Fed.R.Civ.P. 50, Notes of Advisory Committee on 1993 Amendment. Reviewing a Rule 50 determination is preferable to reviewing a summary judgment decision because the Rule 50 decision is based on the complete trial record and not the incomplete pretrial record available at summary judgment.
 
 
 37
 Second, a party that believes the district court committed error in denying summary judgment may move the court to certify the denial for interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(b). S & W did not make such a motion in this case. Although the district court may choose not to certify its decision for interlocutory appeal and the appellate court may choose not to consider the appeal, the aggrieved party retains the option to pursue this remedy and argue that an immediate appeal may substantially advance the termination of the litigation. See Lum v. City & County of Honolulu, 963 F.2d 1167, 1169-70 (9th Cir.) (holding that the "appropriate forum to review the denial of a summary judgement motion is through interlocutory appeal under 28 U.S.C. Sec. 1292(b)"), cert. denied, --- U.S. ----, 113 S.Ct. 659, 121 L.Ed.2d 585 (1992); see also Shaw v. Stroud, 13 F.3d 791, 797-98 (4th Cir.) (agreeing to hear the denial of summary judgment as an interlocutory appeal pursuant to 12 U.S.C. Sec. 1292(b)), cert. denied, --- U.S. ----, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994), and --- U.S. ----, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994).
 
 
 38
 In addition to the above rationales for not reviewing a district court's denial of summary judgment after a full trial, we find the Ninth Circuit's reasoning in Locricchio persuasive. In a passage quoted by several other circuits which have similarly denied review, e.g., Watson, 29 F.3d at 277 n. 3, the court in Locricchio stated:
 
 
 39
 To be sure, the party moving for summary judgment suffers an injustice if his motion is improperly denied. This is true even if the jury decides in his favor. The injustice arguably is greater when the verdict goes against him. However, we believe it would be even more unjust to deprive a party of a jury verdict after the evidence was fully presented, on the basis of an appellate court's review of whether the pleadings and affidavits at the time of the summary judgment motion demonstrated the need for a trial.
 
 
 40
 833 F.2d at 1359. For this reason and the other reasons discussed above, we follow the other Circuits and conclude that this Court will not review, under any standard, the pretrial denial of a motion for summary judgment after a full trial and final judgment on the merits.[11]
 
 III.
 
 41
 Given our decision not to review the district court's denial of S & W's motion for partial summary judgment, we are left to consider the court's denial of S & W's motion for a new trial under Fed.R.Civ.P. 59(a)(1).[12] In considering a motion for a new trial, "a trial judge may weigh the evidence and consider the credibility of the witnesses, and if he finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, he must set aside the verdict, even if supported by substantial evidence, and grant a new trial." Poynter by Poynter v. Ratcliff, 874 F.2d 219, 223 (4th Cir.1989). The decision to grant or deny a motion for a new trial is "within the sound discretion of the district court and will not be disturbed absent a clear showing of abuse of discretion." Wilhelm v. Blue Bell, Inc., 773 F.2d 1429, 1433 (4th Cir.1985), cert. denied, 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); see Bristol Steel & Iron Works v. Bethlehem Steel Corp., 41 F.3d 182, 186 (4th Cir.1994).
 
 
 42
 S & W first discusses the evidence presented at trial and argues that it was a "manifest impossibility" for the jury to find that the operative contract was the P.O. as amended by Amendment 1 because the parties agreed that Amendment 1 modified the original "Engineering Contract." Although S & W nominally seeks review of the district court's denial of its new trial motion, S & W's argument constitutes a direct challenge to the sufficiency of the evidence supporting the jury's verdict. We are substantially limited in our ability to review the sufficiency of the evidence because S & W did not properly move for judgment as a matter of law under Fed.R.Civ.P. 50(b). See Bristol Steel, 41 F.3d at 186 (holding that appellate court is "substantially foreclosed" in reviewing the sufficiency of the evidence when party does not move for judgment as a matter of law). In reviewing the denial of a motion for a new trial, we review the evidence only to determine whether there was "any evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed which, if not noticed, would result in a 'manifest miscarriage of justice.' " Id. at 187 (quoting Coughlin v. Capitol Cement Co., 571 F.2d 290, 297 (5th Cir.1978)).
 
 
 43
 Applying this narrow standard, we find that the record clearly demonstrates that some evidence supports the jury's conclusion that Amendment 1 modified the P.O. For instance, Amendment 1 explicitly referenced the P.O. and the completed Engineering Contract and not the original Engineering Contract.[13] Also, Boynton's testimony at trial illustrated Chesapeake's understanding that Amendment 1 effectively displaced the original Engineering Contract because it modified all the previously controlling portions of the contract.[14] Furthermore, pursuant to the parties' arguments, the district court instructed the jury that the parties' agreement constituted either the original Engineering Contract or the P.O., both as amended by Amendment 1; and evidence supports the jury's decision that the P.O. was the parties' operative agreement.[15]
 
 
 44
 In addition to challenging the sufficiency of the evidence supporting the jury's verdict, S & W complains that the district court abused its discretion in denying a new trial because the court applied the improper legal standard under the controlling Virginia law in assessing whether the weight of the evidence supported the jury's verdict that the P.O. governed the parties' agreement. S & W specifically asserts that the court erroneously relied on evidence demonstrating the parties' subjective intent and not solely on evidence demonstrating the parties' objective manifestations of intent.
 
 
 45
 In its memorandum opinion, however, the district court expressly applied Virginia's objective theory of contracts and recognized that the words and actions, and not the parties' unexpressed intentions, guided its decision on the contract issue. The court quoted language from the P.O. stating that the order "may be accepted only upon the terms and conditions" specified in the P.O. and reasoned that S & W could be bound by the P.O. because it continued to provide services after receiving the order. The district court also listed other evidence as supporting the jury's conclusion that the P.O. governed the parties' agreement,[16] and contrary to S & W's assertions, the court's reference to extrinsic evidence indicating the parties' interpretations does not constitute an abuse of discretion because such evidence is relevant in addressing the formation and interpretation of uncertain contract terms. See Nehi Bottling Co. v. All-American Bottling Corp., 8 F.3d 157, 161-62 (4th Cir.1993) (applying Virginia law); Dart Drug Corp. v. Nicholakos, 221 Va. 989, 277 S.E.2d 155, 158 (1981). The court further considered Boynton's testimony and specifically rejected S & W's contention that Boynton's testimony was untrue. Given the district court's consideration of the conflicting evidence in this case,[17] we hold that the district court did not abuse its discretion in denying S & W's motion for a new trial.
 
 IV.
 
 46
 For the foregoing reasons, we decline to review the district court's denial of S & W's motion for partial summary judgment, and we affirm the district court's denial of S & W's motion for a new trial.
 
 
 47
 AFFIRMED.
 
 
 
 [1]
 At oral argument, Chesapeake initially argued that S & W had not provided any engineering services prior to the submission of the P.O. on October 18, 1989. It later modified its argument and contended that S & W had not provided "substantial" work before the submission of the P.O
 
 
 [2]
 S & W does not argue that the filled-in terms are part of the operative contract in this case. Rather, it contends that the terms and conditions in the original Engineering Contract govern the parties' agreement
 
 
 [3]
 Later in September 1991, Bauer was replaced as Project Manager by Jeffrey Lunde
 
 
 [4]
 S & W did not call Bauer to testify at trial, and S & W resisted Chesapeake's requests that S & W produce Bauer for Chesapeake to call as one of its witnesses
 
 
 [5]
 In a nonbinding, unpublished opinion, this Court has also declined to review the denial of summary judgment after a full trial on the merits of the case. Lewis v. McDorman, No. 93-1736, 1994 WL 376902, at * 3-4 (4th Cir. July 19, 1994). The D.C. Circuit has similarly declined to review the denial of summary judgment after a full trial in a nonbinding, unpublished opinion. Robinson v. Garrett, No. 91-5157, 1992 WL 132470, at * 1 (D.C.Cir. May 8, 1992)
 
 
 [6]
 This Court also reviewed the denial of summary judgment after final judgment in Allied Towing Corp. v. Tatem, 580 F.2d 702 (4th Cir.1978). Allied, however, is not relevant to the general reviewability of summary judgment denials after a full trial because the movant had the specific right to an interlocutory appeal under the admiralty provision in 28 U.S.C. Sec. 1292(a)(3). See Allied, 580 F.2d at 703-04
 
 
 [7]
 To support its contention, S & W cites Pennbarr Corp. v. Insurance Co. of North America, 976 F.2d 145, 149-55 (3d Cir.1992), in which the Third Circuit reversed a district court's order denying a motion for summary judgment on a question of contract law after a full trial and jury verdict on the merits. Although Pennbarr effectively contradicts the holdings from other circuits, Pennbarr, as with Gill, Orlandi, and Smith from this Circuit, did not expressly address the fact that it was reviewing the district court's pretrial order after a full trial on the merits
 
 
 [8]
 Such a dichotomy is supported by the reasoning in Holley, 835 F.2d at 1378 & n. 7, noted above. For the reasons stated in the text, we decline to follow Holley and therefore need not describe specific circumstances in which this Court would review the denial of summary judgment after a full trial
 
 
 [9]
 The court fully reasoned:
 It seems to me after all that has been said and done, there are clearly genuine issues of material fact regarding the formation of the contract, the indication of the contract and ultimately the proper interpretation on what one finds to be the contract between the parties. I think there is sufficient evidence brought forth by both parties to allow a factfinder to go their way, and that's what will happen.
 J.A. 302.
 
 
 [10]
 In this case, for instance, the pretrial record was supplemented by Boynton's testimony at trial. S & W contends that Chesapeake should not be able to argue against appellate review of the district court's pretrial ruling on the summary judgment record because Chesapeake voluntarily chose not to offer Boynton's full testimony prior to trial. S & W, however, offers no evidence to support its allegation that Chesapeake voluntarily withheld this evidence before trial
 
 
 [11]
 Our holding does not apply to decisions reviewing denied motions for summary judgment when the district court granted the opposing party's corresponding summary judgment motion. Our holding also does not affect the de novo standard of review we apply to interlocutory review of a district court's denial of summary judgment. See Shaw, 13 F.3d at 798
 
 
 [12]
 In denying S & W's motion, the district court reasoned:
 Having reviewed the evidence and considered the credibility of the witnesses, this Court finds that the jury's verdict was in accord with the clear weight of the evidence, was not based on false evidence, and will not result in a miscarriage of justice. To the contrary, the Court has determined that substantial justice was done by the finders of fact in this matter.
 J.A. 324.
 
 
 [13]
 On its face, Amendment 1 modified "the Agreement for Engineering and Consulting Services as referenced in Owner's Purchase Order C006097," and this "Engineering and Consulting Services" terminology was included in the unexecuted December 1989 contract and not in the original August 1989 Engineering Contract
 
 
 [14]
 In particular, Boynton testified that he believed that Chesapeake's repeated references to the "Engineering Contract" were references to the August 8, 1989, commitment letter and the attached terms of compensation. This intent was manifested by Chesapeake's stapling of S & W's August 8 commitment letter and schedule of billing rates to the original P.O. found in S & W's contract file
 
 
 [15]
 For instance, the P.O. stated that the order "may be accepted only upon the terms and conditions" specified in the P.O., and S & W did not send any writing to Chesapeake expressly rejecting the P.O. terms
 
 
 [16]
 The court listed, in part, Bauer's internal memorandum indicating S & W's knowledge that Chesapeake preferred to work only with consultants agreeing to its P.O. terms and conditions, the incomplete nature of the original Engineering Contract, Boynton's communication to Bauer that Chesapeake intended its P.O. to govern the parties' agreement, and S & W's unsuccessful attempts to persuade Chesapeake to sign and execute the completed Engineering Contract
 
 
 [17]
 Of the several contract documents circulated between the parties, the evidence before the jury demonstrated that the parties had signed and executed only the Project Confirmation Letter from August 18, 1989, and Amendment 1. Neither the Engineering Contract nor the P.O., the two documents the parties respectively argued were the operative contracts, had been signed and executed by both parties