**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ANGEL WATKINS,
Plaintiff-Appellant,

v.

No. 98-2555

PROFESSIONAL SECURITY BUREAU,
LIMITED,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Herbert N. Maletz, Senior Judge, sitting by designation.
(CA-97-520-L)

Argued: September 23, 1999

Decided: November 15, 1999

Before WILKINS, NIEMEYER, and TRAXLER, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Alvin Dwight Pettit, Baltimore, Maryland, for Appellant.
Brian William McAlindin, WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER, L.L.P., Newark, New Jersey, for Appellee.
**ON BRIEF:** C. William Michaels, Baltimore, Maryland, for Appel-
lant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Angel Watkins appeals an order of the district court granting judgment as a matter of law, or in the alternative a new trial, to Professional Security Bureau, Limited (PSB) on Watkins' claims of sexual harassment and retaliation. See Fed. R. Civ. P. 50(b)-(c), 59. Because we conclude that no rational jury could have failed to find that PSB established an affirmative defense to liability on the harassment claim, and because Watkins failed as a matter of law to carry her burden on the retaliation claim, we affirm.

I.

PSB provides security services on contract to businesses in several states.[1] In August 1995, Watkins was hired by the Baltimore, Maryland branch office of PSB as a security guard. At that time, the Baltimore office was overseen by Charles Fisher, who was vice president of operations for PSB. Edward Kelley served as the branch manager and reported to Fisher. Don Nicola supervised branch employees and reported to Kelley.

_____

[1] As explained in more detail below, in ruling on a motion for judgment as a matter of law, the district court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility, and we must do the same on appeal. See Townley v. Norfolk & W. Ry., 887 F.2d 498, 499 (4th Cir. 1989). In ruling on a motion for a new trial, however, the district court may consider the credibility of the witnesses and weigh the evidence, and our review is for abuse of discretion. See Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp., 51 F.3d 1229, 1237 (4th Cir. 1995). In order to accommodate these differing standards, the facts set forth in the text are those viewed in the light most favorable to Watkins, and relevant conflicts in the evidence are identified in the accompanying footnotes.

2

Watkins testified, and we assume it to be true for purposes of this opinion, that Kelley raped her in the conference room at the Baltimore office on May 24, 1996. Watkins did not report the attack to authorities at the time it occurred, but did notify her doctor.[2] In July and again in mid-August, Watkins told Site Supervisor Hazel Dowling that Kelley had fondled Watkins' breasts and put his hands down her pants as she was changing clothes in the uniform room.[3] Although Watkins indicated that she did not wish to pursue the matter, Dowling promptly notified Nicola of Watkins' allegation. Nicola then interviewed Watkins, who repeated the same allegation but told Nicola that she did not wish to press the issue.[4] Nicola then informed Fisher of the situation. Fisher spoke to Dowling and requested a meeting with Watkins, which she refused on the basis that she did not want

_____

[2] Watkins' doctor testified that her records indicated no report of the rape by Watkins until October 1996. Additionally, although Watkins maintained that she spoke with the police and personnel at the Equal Employment Opportunity Commission (EEOC) on several occasions before formally reporting the rape in mid-September, the record contains no evidence of such contacts.

[3] Dowling testified that her only contact with Watkins occurred between August 9 and September 5--during which time Watkins worked at the site supervised by Dowling--and that during that period Watkins told Dowling that Kelley had fondled her breasts and put his hands down her pants.

[4] As noted above, Watkins maintains that the attack occurred on May 24. Nicola testified, however, that Watkins told him that the incident occurred on the day she was rehired by Fisher after having been terminated by Nicola for poor job performance. According to Nicola, he terminated Watkins in mid-June 1996, and the termination was rescinded on or about the first of July. At that time, Kelley was on leave recuperating from injuries sustained in an automobile accident.

Watkins claims that she was not terminated during the summer of 1996, but rather was "on call" for a brief period due to lack of work. J.A. 256. However, the record contains a termination report filed by Nicola which indicates that Nicola terminated Watkins for poor performance on July 12. The line for the branch manager's signature bears the notation "recinded [sic]" and the initials "CF". J.A. 502. Additionally, Watkins testified to a "conversation" with Fisher in July 1996 during which Fisher told her that she "needed to thank Mr. Kelley for[her] job because he [Fisher] was going to fire [her]." J.A. 256.

3

to follow up on her allegation. Fisher also spoke to Kelley, who denied the accusation made by Watkins. Nevertheless, Fisher instructed Kelley to have no contact with Watkins. Because he had already decided to terminate Kelley for other reasons, and because Kelley was working only part-time and no longer exercised supervisory authority over Watkins, Fisher did not take any further action. Watkins never informed PSB that she was dissatisfied with this result.

Also during August, Watkins was working the night shift at Benet House, a retirement home.[5] During the course of her shift she locked her keys in the day room. Watkins then left the building and went down the street to the handyman's house and asked him to come open the day room door for her. When he refused to do so, Watkins called the manager of the facility, who came and opened the door. The manager subsequently complained to Nicola about Watkins' conduct and ultimately canceled the account.

On September 16, Nicola summoned Watkins to the PSB office, where she met with Nicola, Kelley, and another security officer. Kelley sat behind a desk, while Watkins and Nicola sat in chairs on the other side; the other security officer remained standing. Watkins testified that Kelley told her he had saved her job once, but that she was "still screwing up." J.A. 259. When Kelley further stated that Watkins "owe[d] him a favor," Watkins "stood up, and ... said I don't owe you no favor. You already took advantage of me." Id. Watkins then said that she had spoken to the EEOC and the police and intended to press charges against Kelley. In response, Kelley informed Watkins that she was fired.[6]

_____

[5] Although Watkins testified that the incident at the Benet House occurred during August, Nicola testified that the date was September 15. That is also the date noted on the employee termination report filled out by Nicola.

[6] Nicola's account of the termination is diametrically opposed to Watkins' account. According to Nicola, no confrontation occurred between Kelley and Watkins. Nicola testified that he summoned Watkins to the office and asked her about the incident at Benet House. Watkins acknowledged that she had left her post, at which point Nicola terminated her. According to Nicola, although Kelley was in the PSB office at the time of the meeting, he was not in the conference room during the meeting and had no input into the decision to fire Watkins.

Throughout Watkins' tenure at PSB, the company had a policy against sexual harassment. The basic components of the policy were set forth in a memorandum that was posted on the wall of the conference room where all training was conducted and where employees collected their paychecks. The memorandum encouraged employees who had been harassed to contact PSB's director of human resources and included two phone numbers, one of them toll-free, for such reports. Further, the policy was outlined in detail in the employee handbook, which was given to each employee upon hiring; an additional copy was placed at each security post. And, all employees received training about the policy as part of the orientation process. Watkins denied being given a copy of the employee handbook and denied receiving any orientation or training whatsoever before beginning her employment.[7] Shortly after she was terminated, Watkins instituted this lawsuit alleging quid pro quo and hostile environment sexual harassment based on the rape by Kelley and retaliatory discharge based on her termination after she informed Kelley that she had contacted the EEOC and the police. See 42 U.S.C.A. §§ 2000e-2(a)(1), 2000e-3(a) (West 1994). A jury found in favor of Watkins on the hostile environment and retaliation claims and awarded damages of approximately $63,000; the jury ruled in favor of PSB on Watkins' quid pro quo claim. The district court refused to submit the issue of punitive damages to the jury, concluding that PSB's conduct was not sufficiently egregious to justify an award of punitive damages. Subsequently, the district court granted PSB's motion for judgment as a

_____

[7] Documentary evidence in the record conflicts with Watkins' testimony that she received no training prior to beginning employment with PSB. To begin, the record contains a document signed by Watkins entitled "STANDARDS FOR PROFESSIONAL SECURITY BUREAU EMPLOYEE." J.A. 570. That document provides that "[a]ll applicants must complete the PSB orientation program and pass the examination at the end of the program to be considered for employment." Id. Watkins' signature on this document indicated that she understood and agreed to comply with this requirement. The record also contains a document entitled "EXAMINATION `A', BASIC 8-HOUR PRE-ASSIGNMENT SECURITY OFFICER TRAINING COURSE." J.A. 535. This item, which also was signed by Watkins, consists of a cover sheet and a 50-question test concerning the provision of security officer services. Answers to the questions are marked on the examination.

5

matter of law or in the alternative for a new trial on the hostile environment and retaliation claims.

II.

We review the decision of the district court to grant judgment as a matter of law de novo. See Konkel v. Bob Evans Farms Inc., 165 F.3d 275, 279 (4th Cir.), cert. denied, 68 U.S.L.W. 3106 (U.S. Oct. 4, 1999) (No. 99-180). In so doing, we must view the evidence in the light most favorable to Watkins and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility. See Sales v. Grant, 158 F.3d 768, 775 (4th Cir. 1998). "The question is whether a jury, viewing the evidence in the light most favorable to [Watkins], could have properly reached the conclusion reached by this jury." Benesh v. Amphenol Corp. (In re Wildewood Litigation), 52 F.3d 499, 502 (4th Cir. 1995). We may affirm if a reasonable jury could only rule in favor of PSB; if reasonable minds could differ, we must reverse. See Sales , 158 F.3d at 775; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (explaining that judgment as a matter of law is proper if "there can be but one reasonable conclusion as to the verdict"); Buntin v. Breathitt County Bd. of Educ., 134 F.3d 796, 799-800 (6th Cir. 1998) (observing that judgment as a matter of law on an affirmative defense is appropriate only if the defense is so clearly established "that no rational jury could have found to the contrary" (internal quotation marks omitted)).**8**

A.

Watkins first contends that the district court erred in granting judgment as a matter of law to PSB on her hostile environment claim. In

_____

**8** In contrast, we review a motion for new trial for abuse of discretion. See Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp., 51 F.3d 1229, 1237 (4th Cir. 1995). In ruling on a motion for new trial, the district court "may weigh the evidence and consider the credibility of the witnesses." Id. (internal quotation marks omitted). The district court must grant the motion if it finds that "the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice." Id. (internal quotation marks omitted).

order to establish the existence of a hostile environment, a plaintiff must demonstrate that "(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." Spicer v. Virginia Dep't of Corrections, 66 F.3d 705, 709-10 (4th Cir. 1995) (en banc). There can be little doubt that Watkins' testimony that she was raped by Kelley, which we assume to be true for purposes of this opinion, was sufficient to satisfy the first three elements of a hostile environment claim. See Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995) (explaining that "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment"). Rather, the dispute here centers on whether a reasonable jury could have imputed liability for Kelley's conduct to PSB.

The Supreme Court recently articulated standards for imputing liability to employers in sexual harassment cases. See Burlington Indus., Inc. v. Ellerth, 118 S. Ct. 2257, 2265-70 (1998); see also Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2286-94 (1998). The Court first distinguished between two general types of sexual harassment cases: those in which threats of adverse action in retaliation for denial of sexual favors are carried out in the form of a tangible employment action, and those in which no tangible employment action is taken. See Burlington Indus., 118 S. Ct. at 2264-65. Looking to principles of agency law to inform principles of vicarious liability in Title VII actions, the Court determined that an employer is subject to liability "for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Id. at 2270. When the supervisor has taken no tangible employment action against the victim of harassment, however, the employer may raise an affirmative defense consisting of two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id.

Watkins first argues that the affirmative defense to liability is not available to PSB because her termination constituted a tangible

7

employment action. While Watkins is correct that termination is the quintessential "tangible employment action," see Laughlin v. Metropolitan Washington Airports Auth., 149 F.3d 253, 258 (4th Cir. 1998), there simply is no evidence in the record establishing that Watkins' termination "resulted from a refusal to submit to a supervisor's sexual demands," Burlington Indus., 118 S. Ct. at 2265. Watkins herself acknowledges this fact by arguing that she was terminated in retaliation for threatening to report Kelley's conduct to the police and the EEOC. Accordingly, we hold that PSB was entitled to raise the affirmative defense outlined in Burlington Industries .

Turning to the elements of that defense, we conclude that no reasonable jury could fail to determine that PSB acted reasonably "to prevent and correct promptly any sexually harassing behavior." Id. at 2270. PSB offered essentially uncontradicted evidence that it had in place a comprehensive policy against sexual harassment.[9] While the existence of such a policy will not satisfy the first element of the defense in every case,

> where, as here, there is no evidence that an employer adopted or administered an anti-harassment policy in bad faith or that the policy was otherwise defective or dysfunctional, [its] existence ... militates strongly in favor of a conclusion that the employer exercised reasonable care to prevent and promptly correct sexual harassment.

Brown v. Perry, 184 F.3d 388, 396 (4th Cir. 1999) (internal quotation marks omitted). Additionally, the policy provided that reports of sexual harassment were to be made to the human resources department, so that Watkins was not in the position of having to report Kelley's conduct to someone in his chain of command. See Shaw v. AutoZone, Inc., 180 F.3d 806, 811-12 (7th Cir. 1999) (holding that employer had satisfied first element of affirmative defense as a matter of law based

---

[9] Watkins attempts to create an issue of fact concerning the existence of such a policy by contorting a brief passage from Fisher's deposition in which he demonstrated a failure to understand a question from Watkins' counsel. Despite Watkins' strenuous efforts, we rule that no reasonable fact finder could conclude, based on that passage, that PSB did not have an anti-harassment policy during Watkins' employment with PSB.

8

on existence of anti-harassment policy that, <u>inter alia</u>, allowed victims of harassment to circumvent the chain of command).

Moreover, there can be no dispute that PSB acted promptly upon learning of Watkins' allegations of sexual harassment. Immediately upon receiving Dowling's report in August,[10] Nicola went to Watkins and spoke with her personally; he then relayed the information he had received to Fisher. Fisher, in turn, conducted an investigation that involved speaking with Kelley and attempting to arrange a meeting with Watkins, which Watkins refused. This evidence further indicates that PSB took reasonable care to prevent and promptly correct incidents of sexual harassment.[11] <u>See Brown</u>, 184 F.3d at 396 (noting, in determining that first prong of affirmative defense was established as a matter of law, that "the existence of a viable anti-harassment policy ... [was] accompanied by other undisputed evidence of the employer's reasonable care," including prompt and supportive response to complaint of harassment even though the harassment was not reported under the employer's anti-harassment policy).

Watkins contends that PSB cannot satisfy its burden with respect to the first element of the defense because the record contains evi-

---

[10] Watkins' testimony that she told Dowling of the harassment in July, even if assumed to be true, is irrelevant to the question of whether PSB acted reasonably to prevent and promptly correct Kelley's sexual harassment of Watkins. Dowling testified without contradiction that she did not pass this information on to Nicola until August. Additionally, the record evidence establishes that Dowling, although titled a"site supervisor," had no responsibility to investigate allegations of sexual harassment and no authority to discipline employees; she merely oversaw the particular site to which she was assigned.

[11] The adequacy of PSB's response should be gauged in light of the conduct reported by Watkins. Watkins did not report to Dowling that she had been raped, but rather claimed only that Kelley had fondled her breasts and thrust his hand down her pants. PSB's response to the <u>reported</u> harassment--requiring Kelley to avoid all contact with Watkins --was reasonable and sufficient given that the company had already decided to terminate Kelley for other reasons and that Kelley was no longer exercising supervisory authority. Whether the same remedy would have been adequate to remedy Watkins' subsequent claim of rape is irrelevant.

9

dence that another PSB employee, Kia Odom, complained of harassment by Kelley prior to the time of Watkins' complaint. However, the evidence regarding Odom's complaint is scant at best, and what little evidence there is tends to support a conclusion that Odom made her allegations <u>after</u> Kelley raped Watkins. **12** Obviously, PSB cannot have failed to exercise reasonable care to prevent the harassment of Watkins by Kelley if it was unaware, prior to Kelley's rape of Watkins, that Kelley was a potential predator. <u>Cf. Brown</u>, 184 F.3d at 396 ("The law requires an employer to be reasonable, not clairvoyant or omnipotent."). More importantly, the record contains no evidence concerning the nature of Odom's allegations or PSB's response. The only relevant testimony was from Nicola, who stated that he responded to an inquiry from Fisher regarding the Odom matter. Far from bespeaking an indifference to allegations of sexual harassment, Nicola's testimony indicates that PSB in fact investigated Odom's complaint. Accordingly, we conclude that no reasonable jury could find, based on the mere scintilla of evidence in the record, that PSB's handling of the Odom matter denoted a failure to take reasonable care to prevent and promptly correct sexual harassment.

We also conclude that no reasonable jury could fail to find that PSB satisfied the second element of the affirmative defense. That element requires the employer to establish that the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." <u>Burlington Indus.</u>, 118 S. Ct. at 2270. **13** When an employer has in place a viable anti-harassment policy, a demonstration that an employee unreasonably failed to utilize the complaint procedure provided by the employer "will normally suffice to satisfy the employer's burden under the second element of the defense." <u>Id.</u> Simply put, "the law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists."

_____

**12** For example, Dowling testified without contradiction that she learned of Odom's complaint one month before learning about Watkins' accusations; assuming Watkins first spoke to Dowling in July, Dowling would have spoken to Odom in June.

**13** PSB does not assert that Watkins failed to take appropriate action to avoid being attacked by Kelley.

10

Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1038 (7th Cir. 1998) (internal quotation marks omitted).

Here, there is no dispute that Watkins did not report the rape by Kelley pursuant to PSB's anti-harassment policy, which required that she contact the director of human resources.[14] And, while Watkins told Dowling that Kelley had fondled her breasts and placed his hands down her pants, she repeatedly expressed her unwillingness to pursue the matter. Watkins testified that her failure to report the incident promptly and fully resulted from embarrassment and fear of reprisal.[15] This evidence, however, is insufficient as a matter of law to establish that Watkins acted reasonably in failing to report Kelley according to the anti-harassment policy. See Shaw, 180 F.3d at 813 (holding that embarrassment and fear of retaliation do not justify failure to report harassment, reasoning that "[w]hile a victim of sexual harassment may legitimately feel uncomfortable discussing the harassment with an employer, that inevitable unpleasantness cannot excuse the employee from using the company's complaint mechanisms").

_____

[14] Of course, Watkins did contact PSB's human resources department in September. By that point, however, PSB had already acted on her allegations of misconduct on the basis of the informal report to Dowling.

[15] Watkins also testified that she received no training on the policy, did not receive a copy of the employee handbook containing the policy, and never observed the memorandum concerning the policy that was prominently placed in the conference room. Watkins' lack of knowledge does not establish the reasonableness of her failure to report the harassment pursuant to the policy. PSB took pains to make its employees aware of the policy by posting the memorandum prominently in an area frequented by all PSB employees and by placing copies of the employee handbook at each and every work site (indeed, Nicola personally placed new handbooks at the work sites because the older versions were worn). Under these circumstances, a reasonable jury could only conclude that Watkins was at least constructively aware of the policy. Cf. Shaw, 180 F.3d at 811 (holding that employee who disclaimed actual knowledge of anti-harassment policy was constructively aware of it when she signed a document acknowledging receipt of the employee handbook, which contained the policy).

Accordingly, we hold that no reasonable jury could have concluded that PSB failed to establish the second prong of the affirmative defense.**16**

In summary, we affirm the grant of judgment as a matter of law to PSB on Watkins' claim of sexual harassment. Although Watkins established the existence of a hostile environment, we conclude that no rational jury could have failed to find that PSB established the elements of the affirmative defense to liability set forth in Burlington Industries.

B.

Next, Watkins maintains that the district court improperly granted judgment as a matter of law to PSB on her retaliation claim. We disagree.

Claims of retaliation may properly be analyzed according to the burden-shifting proof scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998). Under this scheme, a

_____

**16** Even if Watkins' disclosure of the harassment to Dowling were adequate to establish that she took advantage of available preventive or corrective opportunities, our result would be the same. Although the Supreme Court did not speak to this issue in Burlington Industries, we cannot conceive that an employer that satisfies the first element of the affirmative defense and that promptly and adequately responds to a reported incident of sexual harassment--as PSB did here, see supra note 11--would be held liable for the harassment on the basis of an inability to satisfy the literal terms of the second element of the affirmative defense. See Indest v. Freeman Decorating, Inc. , 164 F.3d 258, 265-66 (5th Cir. 1999); Coates v. Sundor Brands, Inc. , 164 F.3d 1361, 1369 (11th Cir. 1999) (Barkett, J., concurring specially) ("Under the framework established by the Court in Faragher and Burlington Industries, a prompt response by an authorized agent to halt reported harassment is sufficient to relieve the employer of liability under Title VII in cases where [there has been no tangible employment action]."). Such a result would be wholly contrary to a laudable purpose behind limitations on employer liability identified by the Supreme Court in Burlington Industries: to promote conciliation. See Burlington Indus., 118 S. Ct. at 2270.

12

plaintiff must first allege a prima facie case of discrimination by demonstrating that "(1) she engaged in protected activity, (2) the employer took adverse action, and (3) there was a causal connection between the two." Id. The burden then shifts to the employer to articulate a

legitimate, nonretaliatory reason for its action; if it succeeds in doing so, the burden shifts back to the employee to establish that the employer's asserted reason is pretextual. See id.

Here, Watkins certainly presented a prima facie case of retaliation: She informed Kelley that she had reported the harassment to the EEOC; she was terminated; and the temporal proximity of these two events provides evidence of a causal connection between them, see

Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 443 (4th Cir. 1998) (noting that "very little evidence of a causal connection is required to establish a prima facie case" and that mere temporal proximity is suf-

ficient to demonstrate causality). However, PSB offered a legitimate, nonretaliatory reason for her discharge: Watkins undisputedly left her post at Benet House, a disciplinary infraction subject to immediate termination. And, Watkins offered no evidence whatsoever that this

reason was a mere pretext for retaliation. See id. at 444. We therefore affirm the grant of judgment as a matter of law on this claim.

III.

For the reasons set forth above, we conclude that the district court correctly granted judgment as a matter of law to PSB on Watkins'

claims of sexual harassment and retaliation. Accordingly, we affirm.**17**

AFFIRMED
_____

**17** In view of our affirmance of the grant of judgment as a matter of law, we need not consider whether the district court abused its discretion in granting the alternative motion for a new trial, nor need we address Watkins' appeal of the refusal of the district court to submit the issue of punitive damages to the jury.

13