**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

WENDY JO BROWN,
Plaintiff-Appellant,

v.

WILLIAM J. PERRY, Secretary of
Defense,
Defendant-Appellee.

No. 97-1501

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Jillyn K. Schulze, Magistrate Judge.
(CA-96-47)

Argued: January 29, 1998

Decided: July 14, 1999

Before MURNAGHAN, NIEMEYER, and MOTZ,
Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Murnaghan joined. Judge Niemeyer concurred in the
judgment.

_____

**COUNSEL**

**ARGUED:** Stephen Zak Chertkof, HELLER, HURON, CHERTKOF,
LERNER & SALZMAN, Washington, D.C., for Appellant. Perry F.
Sekus, Assistant United States Attorney, Baltimore, Maryland, for
Appellee. **ON BRIEF:** Tracy L. Hilmer, Kensington, Maryland, for

Appellant. Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.

_____

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

To resolve this Title VII appeal we need only determine whether the evidence forecast by the plaintiff would, if proved, render her employer vicariously liable for a supervisor's sexual harassment. Wendy Jo Brown appeals the grant of summary judgment to her former employer, the Army and Air Force Exchange Service (AAFES) of the United States Department of Defense, maintaining that AAFES should be found liable for sexual harassment perpetrated on her by one of her supervisors. We held this case in abeyance pending the Supreme Court's decisions in Faragher v. City of Boca Raton, 118 S. Ct. 2275 (1998), and Burlington Indus. v. Ellerth, 118 S. Ct. 2257 (1998). Guided by those opinions, we now affirm, albeit for reasons somewhat different than those relied on by the magistrate judge.

I.

We state the facts in the light most favorable to Brown, the non-moving party with respect to the summary judgment granted below.

In April 1992, AAFES, a nonappropriated fund instrumentality of the Department of Defense which provides goods to members of the military and their dependents, hired Brown as an exchange detective. She was charged with investigation of employee theft and shoplifting at the Regional Exchange in Fort Meade, Maryland.

Brown reported to and was evaluated by supervisory exchange detective Timothy Boles, who in turn reported to exchange manager George Bass. Brown received technical assistance, including work assignments, from Alwyn Ansley, the area loss prevention manager for the lower Mid-Atlantic AAFES region. Ansley was supervised by William Boyd, Chief of Safety and Security for AAFES's Eastern Region, who was stationed in Texas. In preparing Brown's perfor-

2

mance evaluations, Boles consulted with Ansley and Bass. Although Boyd was not directly involved with any employment decisions concerning Brown, Brown believed that Boyd could influence her career and future advancement.

Brown first encountered Boyd when he visited Fort Meade and met briefly with exchange detectives. Brown did not have any conversation with Boyd at that meeting.

In March 1993, Brown and Boyd met for the second time, at a required AAFES conference for loss prevention personnel held at the Ramada Inn in Alexandria, Virginia. As the senior loss prevention employee at the conference, Boyd hosted a social gathering in his suite on the first evening for conference attendees. Brown attended this non-mandatory gathering at the urging of Ansley, who encouraged Brown to go and meet more of her colleagues.

Approximately seven employees were present when Brown arrived at Boyd's suite, but by about 11:30 p.m. everyone had left the suite except for Boyd and Brown. The two then discussed Brown's career for approximately half an hour before Brown decided to leave. According to Brown, as she moved toward the door, Boyd grabbed her shoulders, pushed her against the wall, and kissed her face and neck. He told her, "[Y]ou're so beautiful. I can make you feel like no one else can." Brown freed herself and left Boyd's room. Boyd, however, followed her and when she reached the door to her room in the hotel, he kissed her and stated, "You know, baby, I'll always take care of you." Brown then managed to elude Boyd's grasp and entered her own room.

Brown immediately contacted Boles, her supervisor, about the incident. Boles responded by telling Brown, "Whatever you want to do, I'll support you 100%," and by suggesting that Brown speak with an EEO counselor. He also offered to speak with Ansley about the incident.

In the morning, Brown herself spoke to Ansley, who responded that "he had spoken to Mr. Boles about what had happened and that he did not want to hear anything from me until I decided what I was going to do because he would have to be doing the investigation."

3

This upset Brown because she was hoping Ansley would be more supportive.

The next day Brown advised Ansley that she had "decided not to do anything" about Boyd's conduct, i.e., not to pursue any grievance. Neither Boles nor Ansley investigated the matter further. Brown did tell Ansley that she would like Boyd to apologize (which Boyd ultimately did). During the remainder of the conference, Brown did not have any contact with Boyd, except to attend his lecture.

Brown did not experience any work-related problems because of the March incident with Boyd, and she continued to excel at her job. As a result of discussions with her husband, she decided "to let bygones be bygones and hopefully I wouldn't have to see him again and I was worried about my career and I just went on."

Brown had no further contact with Boyd until September 21, 1993, when AAFES held another conference at the same hotel in Alexandria, Virginia. Again, AAFES required Brown to stay at the hotel and attend the conference. Boyd was also present at the conference, and he once again held a non-mandatory social gathering in his suite on the first night of the conference. Brown was reluctant to attend and she advised Boles and Ansley of her reluctance. After both men "stressed the importance to her career of attending the social" and assured her that if she decided to attend they would be there with her, Brown agreed to go to the gathering. Boles accompanied Brown to the gathering, and upon their arrival Boyd apologized to Brown for his previous conduct. Brown and Boyd then shook hands, which made Brown feel more relaxed.

Brown was once again the last guest at the gathering. Brown and Boyd again began to discuss Brown's career. Boyd noted that Boles would be leaving his job, implying that Brown should apply for Boles's position. Boyd did not, however, explicitly offer to assist Brown in obtaining that position.

Brown and Boyd then left the hotel and walked to a pub, where they each had a beer. While at the pub, they continued to discuss her career. After 20-25 minutes, Brown and Boyd left the pub and went across the street to a reggae bar. Boyd tried to get Brown to dance

4

with him, but Brown said she was tired and refused. After about 30 minutes at the reggae bar, they returned to the hotel.

Upon arriving at the hotel at approximately midnight, Boyd asked Brown if she would come up to his room. Brown agreed after Boyd promised "he would not touch her in any way." Brown had earlier cautioned Boyd not to touch her and each time Boyd had agreed not to.

Once they were in Boyd's suite, while Brown was in the bathroom, Boyd turned off the lights and put on music. Upon discovering this, Brown stated that she was going to leave. Boyd grabbed her by the arms, got down on his knees, and pulled her on top of him. As Brown tried to free herself, Boyd continually kissed and groped her. Once she was out of his grasp and was heading for the door, Boyd stated, "It's your word against mine," and gestured for her to leave.

Brown went back to her room and unsuccessfully attempted to reach her husband. She did not try to contact anyone else about the incident. In fact, throughout the rest of the conference, Brown did not tell anyone about the incident and continued to participate in conference events.

Upon returning to work at Fort Meade, Brown informed Boles and Ansley about the incident. They were not supportive, expressing surprise and dismay that Brown would have allowed herself to be alone with Boyd again.

A few days later, Brown, pursuant to the AAFES anti-harassment policy, filed an informal EEO complaint about the September incident. She eventually also filed a written complaint and sought EEO counseling. In addition, Brown reported the incident to Leigh Farney, the human resource manager for the Fort Meade Exchange. Brown and Farney met with the exchange's manager, George Bass, who reported Brown's allegations to AAFES's Dallas headquarters.

On October 29, 1993, AAFES issued a restraining order in response to Brown's charges that required Boyd to refrain from having any further direct or indirect contact with Brown or with "anyone

5

assigned in any capacity to the Ft. Meade Exchange." After EEO counseling, Brown entered into a voluntary settlement agreement with AAFES on November 23, 1993. The agreement provided that (1) the director of loss prevention would issue a formal apology to Brown, (2) Boyd would have no further contact with Brown and no dealings with any employee assigned to the Ft. Meade Exchange, and (3) Brown's allegations would be investigated and appropriate corrective action taken upon completion of the investigation. Brown was satisfied with this action at the time.

As a result of the investigation conducted pursuant to the settlement agreement, Boyd received a 30-day suspension in June 1994 for his "inappropriate physical contact and advances towards" Brown and several other inappropriate work-related activities. This was not the first time AAFES disciplined Boyd. In January 1993 (prior to both incidents), Boyd had been counseled about several work-related issues "including the inviting of female detectives to his room, inviting female detectives to ride with him, making comments about their looks, etc." He had allegedly commented to a female exchange detective "while looking at her nipples (through her clothing) that he could see that she was really cold." In March 1993, employees reported that a year earlier Boyd had asked a female employee to sit on his lap and commented that her chest was "well endowed," had made public comments about dildos, and had spoken of enjoying toe sucking. In January 1994, (after both incidents with Brown) still another female employee reported that Boyd introduced her as his "sexy-tary" and had engaged in other vulgarisms. None of these employees has ever claimed that Boyd touched her inappropriately.

Boyd never spoke to or had any contact with Brown after the September 1993 incident. In November 1993, Brown was promoted to Boles's former position; Boyd played no role in the promotion.

After the September incident, Brown's job performance began to decline. She also started having suicidal thoughts, nightmares, and difficulty concentrating. In December 1993, Brown discovered that Boyd had sent e-mail messages to Ansley in Ft. Meade, causing her to believe that Boyd had violated the settlement agreement. On January 10, 1994, Brown left her position at AAFES and she entered Walter Reed Army Hospital the next day. She was diagnosed with post-

6

traumatic stress disorder and depression. She and her husband divorced soon thereafter. Brown remains unemployed.

II.

On January 5, 1996, Brown filed this action against the then Secretary of Defense, William J. Perry, alleging that she had been sexually harassed in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-16 (West 1994), and seeking injunctive relief and money damages.

Following discovery, the Secretary moved for summary judgment. In response, Brown maintained that she had forecast sufficient evidence to proceed to trial on her sexual harassment claim under either a quid pro quo or hostile work environment theory. After thoroughly detailing the relevant facts and carefully applying the then controlling circuit precedent, the magistrate judge concluded that Brown had failed to present sufficient evidence to proceed under either theory. Hence, she granted summary judgment to the Secretary.

In order to prove a quid pro quo case -- i.e., that an employee's receipt of a job-related benefit or detriment depended on the employee's reaction to a supervisor's unwelcome sexual harassment -- at the time of the magistrate judge's decision, circuit precedent required a plaintiff to establish five elements:

> 1. The employee belongs to a protected group.
>
> 2. The employee was subject to unwelcome sexual harassment.
>
> 3. The harassment complained of was based upon sex.
>
> 4. The employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability. Fur-

7

ther, as in typical disparate treatment cases, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision.

5. The employer, as defined by Title VII, 42 U.S.C. § 2000e(b), knew or should have known of the harassment and took no effective remedial action.

Spencer v. General Elec. Co., 894 F.2d 651, 658 (4th Cir. 1990) (footnote omitted). The fifth element was "automatically met" when the harassment was alleged to have been perpetrated by a supervisor. Id. at 658 n.10 ("[W]here the harassment is being committed by one of the employer's supervisors . . . knowledge of the harassment is imputed to the employer.").

The magistrate judge concluded that Brown had forecast sufficient evidence to survive summary judgment on the first three elements of the quid pro quo test. However, she held that Brown had produced no evidence to establish the fourth element, i.e. , that Boyd "assisted [Brown] in obtaining a job benefit or caused her to suffer a detriment."

The magistrate judge also noted the requirements of circuit precedent concerning claims of what the judge characterized as the "second form of Title VII sexual harassment," the "creation of a hostile work environment." To establish a hostile work environment claim, a plaintiff was required to prove four elements:

(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer.

Spicer v. Virginia, 66 F.3d 705, 710 (4th Cir. 1995) (en banc). The magistrate judge found Brown's evidence sufficient to sustain a finding in her favor on the first three elements, but not the fourth. At the

8

time of the judge's decision, circuit law provided that liability could only be imputed to an employer in a hostile environment claim based on a supervisor's conduct if a plaintiff could prove that the "employer knew or should have known of the illegal conduct and failed to take prompt and adequate remedial action." Andrade v. Mayfair Management, Inc., 88 F.3d 258, 261 (4th Cir. 1996). The magistrate judge concluded that "no reasonable factfinder could conclude that the remedial action taken here was anything short of prompt and adequate."

Brown appealed, asserting that the magistrate judge had erred with respect to both her quid pro quo and hostile environment claims. Brown maintained that she had forecast sufficient evidence to entitle her to trial on both theories. The parties fully briefed and we heard argument on the viability of these theories under the facts of this case.

Recognizing that the Supreme Court had granted certiorari in Faragher and Burlington and that the Court's resolution of those cases could clarify or even change the governing legal principles, we held this case in abeyance pending the issuance of those decisions. The Supreme Court's opinions in those cases did indeed change the applicable legal principles, and the parties in this case accordingly submitted supplemental briefs, which we appreciate and have carefully considered.[1]

III.

In Faragher and Burlington, the Supreme Court provided much-needed guidance as to the proper analysis of sexual harassment claims and, most particularly, as to the circumstances in which an employer can be held liable for a supervisor's harassment of a subordinate.

The Court initially instructed that classification of alleged discrimination as either "quid pro quo" or"hostile work environment" harassment plays no role in the decision as to whether an employer will be

_____

[1] The Secretary asserts in his supplemental brief, as he did in his principal brief, that Boyd "was not Brown's supervisor." Supplemental Brief of Appellee at 6. In view of our resolution of this case, we need not reach that question.

9

held vicariously liable for the acts of a supervisor. Although those terms may describe or illustrate different types of sexual harassment, they are otherwise of "limited utility." Burlington, 118 S. Ct. at 2264. They are only relevant to the "threshold question[of] whether a plaintiff can prove discrimination in violation of Title VII." Id. at 2265.[2] The Court further held that "the factors" it would set forth, "not the categories quid pro quo and hostile work environment, will be controlling on the issue of vicarious liability for alleged sexual harassment." Id. at 2265. The Court thus made it clear that whether a claim is of the quid pro quo or hostile work environment variety does not govern the determination of vicarious liability under Title VII.

In limiting the use of the two categories as it did, the Court rejected the distinction that we (and other circuits) had drawn when imputing liability to an employer for the acts of a supervisor. As noted above, circuit case law prior to Faragher and Burlington provided that in quid pro quo cases, liability would be imputed to an employer "automatically," but that in hostile environment cases, liability would be imputed to the employer only when the employer knew or should have known of the supervisor's acts and failed to take prompt and adequate remedial action. In Faragher and Burlington the Supreme Court directed that vicarious liability in all sexual harassment suits is to be decided under one set of factors.

The Court then went on to set forth those factors. Whenever sexual harassment by a supervisor takes the form of a "tangible employment action" against a subordinate, vicarious liability will be imposed on the employer. Id. at 2269; see also Faragher, 118 S. Ct. at 2293 ("[W]hen the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment" an employer is vicariously liable); Burlington, 118 S. Ct. at 2270 (same). In these circumstances, "[n]o affirmative defense is available" on the issue of vicarious liability. Id.; accord Reinhold v. Virginia, 151 F.3d 172, 174-75 (4th Cir. 1998). The Court explained that its holding is based on the rule that a principal is liable when its

_____

[2] The Secretary makes no claim that Boyd's conduct in September 1993 was not "sufficiently severe and pervasive to constitute discrimination under Title VII." Cf. Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 183 (4th Cir. 1998).

agent has been aided by the agency relationship in causing the harm alleged. See Burlington, 118 S. Ct. at 2267-69. Because a tangible employment action would not be possible "absent the agency relation," the Court concluded that "it would be implausible to interpret agency principles to allow an employer to escape liability" for any such action perpetrated by a supervisor against a subordinate. Id. at 2269. Thus, "[w]hatever the exact contours of the aided in agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate." Id. (emphasis added).

The Supreme Court further directed that even when a supervisor's harassment does not involve a tangible employment action, an employer may still be "subject to vicarious liability to a victimized" subordinate. Faragher, 118 S. Ct. at 2292-93; Burlington, 118 S. Ct. at 2270. However, "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages." Faragher, 118 S. Ct. at 2293; Burlington, 118 S. Ct. at 2270; accord Lissau v. Southern Food Serv., Inc. , 159 F.3d 177, 182 (4th Cir. 1998).

To escape liability for a supervisor's harassment of a subordinate by means of this affirmative defense, an employer must prove by a "preponderance of the evidence . . . two necessary elements." Faragher, 118 S. Ct. at 2293; Burlington, 118 S. Ct. at 2270. First, the employer must establish that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." Id.; accord Reinhold, 151 F.3d at 175. Second, the employer must demonstrate "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 118 S. Ct. at 2293; Burlington, 118 S. Ct. at 2270.

The employer's institution and enforcement of an anti-harassment policy and an adequate complaint procedure, while not required "in every instance as a matter of law," is certainly relevant in establishing the first element of the affirmative defense. Id. Conversely, proof that a plaintiff employee failed to follow a complaint procedure "will normally suffice to satisfy the employer's burden under the second element of the defense." Id. Such proof is not, however, the only way

11

in which an employer can establish the second element. Id. ("proof . . . is not limited to showing an[ ] unreasonable failure to use [the] complaint procedures").

With these principles in mind, we turn to the case at hand.

IV.

Faragher and Burlington considerably simplify our resolution of this case.

The undisputed facts clearly demonstrate that Brown suffered no tangible employment action at Boyd's hands. Boyd simply took no part in any decision to hire, fire, discharge, transfer, or reassign Brown, or in any way to alter her employment benefits. Indeed, the only tangible employment action taken with regard to Brown during the relevant period was her promotion to Boles's former position, and Brown concedes that Boyd "had no role in the promotion." Brief of Appellant at 8. Because Brown indisputably suffered no tangible employment action, Faragher and Burlington direct that imputation of liability to her employer is not automatic.

Even in the absence of a tangible employment action, however, vicarious liability will be imposed unless the employer can make out the affirmative defense described in Faragher and Burlington. The undisputed facts in this case demonstrate that AAFES has satisfied both elements of that affirmative defense.

As a preliminary matter, we note that AAFES needs no defense with respect to Boyd's advances on Brown at the March conference. Brown has never sought recovery for damages arising from that incident. Furthermore, the district court held, and Brown does not seriously dispute on appeal, that "no factfinder would conclude that [Brown] subjectively perceived her work environment as hostile or abusive during the period between the first assault and the second." The uncontroverted facts support this conclusion. The quick and wholehearted support provided to Brown by her supervisor when she reported the March assault, Brown's decision not to pursue disciplinary action against Boyd after that incident, her continued excellent job

12

performance, the fact that she had no contact with Boyd between the two incidents, and her ultimate attendance at the September gathering all indicate that Brown suffered no hostile work environment as a result of Boyd's advances in March. Accordingly, the only issue before us is whether AAFES established an affirmative defense as to the September incident.

As to the first element of the affirmative defense-- whether the employer has proved that it exercised reasonable care to prevent and correct the harassment -- the record reflects that AAFES had in place an anti-harassment policy (including a complaint procedure) designed to deter sexual harassment. We recognize that an employer can meet its burden as to the first element without such a policy, Faragher, 118 S. Ct. at 2293; Burlington, 118 S. Ct. at 2270, and that mere promulgation of such a policy may well fail to satisfy the employer's burden. The employer must act reasonably, and thus any policy adopted by the employer must be both reasonably designed and reasonably effectual. See Faragher, 118 S. Ct. at 2293-94; see also Reinhold, 151 F.3d at 175. But where, as here, there is no evidence that an employer adopted or administered an anti-harassment policy in bad faith or that the policy was otherwise defective or dysfunctional, the existence of such a policy militates strongly in favor of a conclusion that the employer "exercised reasonable care to prevent" and promptly correct sexual harassment. Faragher, 118 S. Ct. at 2293; accord Lissau, 159 F.3d at 182.

Furthermore, the existence of a viable anti-harassment policy in this case is accompanied by other undisputed evidence of the employer's reasonable care. First, with regard to prevention of the September incident, Brown herself concedes that as soon as she told Boles about the March incident, he fully supported her. Boles immediately told her, "Whatever you do, I'll support you 100%," and then suggested that she contact an EEO counselor. Brown, however, told her supervisors that she did not want "to do anything" about Boyd's first advance. Brown's supervisors respected her wishes and did not pursue the matter.

Apparently in doing so they violated an AAFES directive that all instances of sexual harassment, even those a victim does not want to pursue, must be reported to a "resources manager." Although this

13

directive seems a wise one, no reasonable factfinder could conclude that in this case the supervisors did not take adequate action. They were confronted with a victim who was continuing to work effectively and did not wish to pursue the matter, who reported a single incident of harassment perpetrated by a supervisory employee with whom she would have very limited future contact. We believe that in these circumstances offering immediate unconditional support to the victim and suggesting that she pursue her EEO remedies constitutes an entirely reasonable effort to prevent further incidents. That this effort proved unsuccessful is unfortunate, but it does not mean that the effort was unreasonable. Sometimes, as in this case, an employer's reasonable attempt to prevent future harm will be frustrated by events that are unforeseeable and beyond the employer's control. The law requires an employer to be reasonable, not clairvoyant or omnipotent.

The evidence as to the reasonableness of AAFES's <u>corrective</u> action is similarly clear. When Brown did file an EEO complaint after the September incident, AAFES took prompt corrective action. AAFES immediately issued a restraining order prohibiting Boyd from having any contact with Brown or other Ft. Meade employees. In addition, Brown entered into a voluntary settlement agreement with AAFES in which the agency agreed to investigate Boyd, to take appropriate corrective action, to issue Brown a formal apology, and to reiterate its order to Boyd to cease all contact with Brown and other Ft. Meade employees. Upon receiving these orders, Boyd never again had any contact with Brown. Moreover, AAFES did, in fact, investigate Boyd, after which it suspended him for thirty days for inappropriate work-related activities including "inappropriate physical contact and advances toward Brown." Even Brown acknowledged that at the time she was satisfied that these constituted adequate corrective measures by AAFES.

Later, of course, Brown contended that AAFES's corrective efforts, like its preventive ones, were inadequate. Specifically, she asserts that she never received a formal apology and that Boyd continued some business e-mail communications to other Ft. Meade employees, that the settlement agreement was thus violated, and that AAFES did nothing to remedy this. Even if the agreement was technically violated in these respects, in view of the fact that AAFES's

14

response pursuant to its established anti-harassment policy succeeded in permanently ending Boyd's harassment of Brown and punishing Boyd for his past behavior, no reasonable factfinder could conclude that AAFES's action did not constitute reasonable corrective measures. Again, the law requires reasonableness, not perfection.

In sum, a reasonable finder of fact considering AAFES's fully functioning anti-harassment policy; Boles's immediate support for Brown after the first incident; AAFES's issuance of a restraining order prohibiting Boyd from having any contact with Brown, which succeeded in stopping any further harassment; AAFES's undertaking of an investigation of Boyd; and finally AAFES's suspension of Boyd for thirty days could only conclude that AAFES did "exercise[ ] reasonable care to prevent and correct promptly" Boyd's "sexually harassing behavior." Faragher, 118 S. Ct. at 2293; Burlington, 118 S. Ct. at 2270. Thus, we must conclude that AAFES has met its burden on the first element of the affirmative defense.

With regard to the second element, the evidence that AAFES met its burden is just as clear. Contrary to the parties' apparent belief, in order to satisfy this element an employer need not demonstrate that an employee "unreasonably failed" to follow a "complaint procedure" or "to take advantage of any preventive or corrective opportunities provided by an employer." Id. Rather, an employer can prove the second element of the affirmative defense by demonstrating that the "plaintiff employee unreasonably failed . . . to avoid harm otherwise." Id.

The record in this case is replete with uncontroverted evidence that Brown utterly failed to "avoid harm otherwise." Less than six months after rebuffing advances from Boyd in his hotel room late at night, Brown unnecessarily put herself in a situation that permitted repetition of precisely the same kind of advances. By her own account, Brown voluntarily decided to remain alone in Boyd's hotel room with him at night during the September conference even though the March incident was fresh in her mind. Brown not only remained alone with Boyd in his room for a second time, she also accepted Boyd's invitation to visit first a pub and then a reggae bar following the party. Finally, after the bar-hopping, Brown agreed to return to Boyd's hotel room at midnight. In light of her previous history with Boyd, no rea-

15

sonable factfinder could reach any conclusion other than that Brown "unreasonably failed . . . to avoid harm." Id. Thus, the undisputed facts demonstrate that AAFES satisfied the second element of the affirmative defense as well as the first; hence, it cannot be held vicariously liable for Boyd's harassment of Brown.

V.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

NIEMEYER, Circuit Judge, concurring in the judgment:

I agree that the district court should be affirmed in this case and therefore concur in the judgment.

16