WYNN, Circuit Judge,
concurring in part and concurring in the judgment:
In this case, Katrina Okoli (“Okoli”) was fired after rejecting what she alleged to be persistent sexual advances, of both a verbal and physical nature, made by her supervisor, John Stewart (“Stewart”). I agree with the majority that, when the evidence is viewed in the light most favorable to Okoli, the nature and prevalence of Stewart’s alleged advances was sufficient to support a hostile work environment claim under Title VII. That said, I differ somewhat in my analysis of the causal link between Okoli’s opposition to those sexual advances and the adverse employment action eventually taken against her. Ultimately, however, I too would conclude that the district court erred in granting summary judgment to the defendants regarding Okoli’s quid pro quo and retaliation claims.
I.
Under Title VII, it is illegal for an employer to “discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual’s race, col- or, religion, sex, or national origin.” 42 U.S.C. § 2000e-2. This language encompasses a prohibition on sexual harassment in the workplace. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64-65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Because Okoli brought both a “quid pro quo ” claim and a “hostile work environment” claim, this case requires us to address two distinct types of workplace sexual harassment that constitute intentional discrimination in violation of Title VII.
The terms “quid pro quo ” and “hostile work environment” are absent from the statutory text of Title VII. As recognized by the Supreme Court,
The terms appeared first in the academic literature, see C. MacKinnon, Sexual Harassment of Working Women (1979); found their way into decisions of the Courts of Appeals, see, e.g., Henson v. Dundee, 682 F.2d 897, 909 (C.A.11 1982); and were mentioned in this Court’s decision in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 [106 S.Ct. 2399, 91 L.Ed.2d 49] (1986). See generally E. Scalia, The Strange Career of Quid Pro Quo Sexual Harassment, 21 Harv. J.L. & Pub. Policy 307 (1998).
Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 752, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In her book, Professor MacKinnon distinguished between “harassment that creates an offensive environment (‘condition of work’ harassment) and harassment in which a supervisor demands sexual consideration in exchange for job benefits {‘quid pro quo ’).” Henson, 682 F.2d at 908 n. 18 (citing C. MacKinnon, *226 Sexual Harassment of Working Women 32-47 (1979)). In 1983, this Court adopted the dichotomy suggested by Professor MacKinnon and agreed that there are these “two basic varieties” of sexual harassment. Katz v. Dole, 709 F.2d 251, 254 (4th Cir.1983) (citing Henson, 682 F.2d at 908 n. 18), abrogated on other grounds as recognized in Mikels v. City of Durham, N.C., 183 F.3d 323 (4th Cir.1999).
In 1986, a useful distinction between so-called quid pro quo claims and hostile work environment claims was drawn by the Supreme Court in Meritor. Essentially, the court was asked to rule on whether a claim of “hostile environment” sexual harassment is a form of actionable sex discrimination under Title VII. More precisely, the Court considered whether constructive changes to the conditions of employment, absent evidence of direct financial injury[1], could support Title VII liability. The Court noted that the EEOC’s Guidelines supported the conclusion that sexual misconduct violates Title VII “whether or not it is directly linked to the grant or denial of an economic quid pro quo, where ‘such conduct has the purpose or effect of unreasonably interfering with an individual’s work performance or creating an intimidating, hostile, or offensive working environment.’ ” 477 U.S. at 65, 106 S.Ct. 2399 (quoting 29 C.F.R. § 1604.11(a)(3)). The Court ultimately held that “a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment.” Id. at 66, 106 S.Ct. 2399; see also id. at 65, 106 S.Ct. 2399 (referring to these claims as involving “so-called ‘hostile environment’ (i.e. non quid pro quo) harassment”).
After Meritor, the Supreme Court has instructed that “[t]he principal significance of the distinction [drawn therein between quid pro quo claims and hostile work environment claims] is to instruct that Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment and to explain the latter must be severe or pervasive.” Burlington, 524 U.S. at 752, 118 S.Ct. 2257. In Burlington, the Court considered whether, when an employer threatens to retaliate against an employee if she denies him sexual liberties, Title VII liability exists if the threat is not carried out. The Court concluded that even when the employer does not act on such a threat, if the sexual harassment is sufficiently severe or pervasive, liability can exist on the theory that the harassment constructively altered the employee’s conditions of employment by creating a “hostile work environment.” Id. at 753-54, 118 S.Ct. 2257. The Court stated that, the labels “quid pro quo ” and “hostile work environment,” when applied to a sexual harassment claim, “illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general.” Id. at 753, 118 S.Ct. 2257.[2]
*227 II.
I agree with the majority that, when viewed in the light most favorable to Okoli, the litany of unwelcome sexual advances allegedly made by Stewart was sufficiently severe and pervasive to alter the conditions of Okoli’s employment by creating a hostile work environment.[3] Moreover, I agree that Okoli’s firing constituted a tangible employment action. In other words, drawing every inference in her favor, Okoli has demonstrated both constructive and explicit changes to the terms and conditions of her employment. To recover for the latter, however, Okoli must demonstrate that her rejection of Stewart’s sexual advances was the basis for the decision to terminate her “at will” employment contract.
Perhaps due to Professor MacKinnon’s initial conception of “quid pro quo ” harassment, courts have sometimes insinuated that to recover on that theory, a plaintiff must demonstrate that the receipt of a job benefit was conditioned on acceptance of a supervisor’s sexual advance. See, e.g., Spencer v. Gen. Elec. Co., 894 F.2d 651, 658 (4th Cir.1990) (defining “quid pro quo sexual harassment” as that in which “sexual consideration is demanded in exchange for job benefits”), abrogated on other grounds, Farrar v. Hobby, 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); Katz, (defining “quid pro quo sexual harassment” as “harassment in which a supervisor demands sexual consideration in exchange for job benefits....” (quoting Henson, 682 F.2d at 908 n. 18)).
In this case, there was no evidence that Stewart ever expressly conditioned Okoli’s job or the benefits thereof on her acceptance of his sexual advances.[4] Cf. Burlington, 524 U.S. at 747-48, 118 S.Ct. 2257 (supervisor warned employee who gave no encouragement to sexual commentary to “loosen up” because he “could make [her] life very hard or very easy at Burlington”); *228 Katz, 709 F.2d at 254 (“Uncontradicted testimony by Katz indicated that the supervisor ... once stated in her presence that he would consider accepting her transfer to his crew because of her sexual abilities.”). Indeed, even when viewed in the light most favorable to Okoli, there is scant evidence that such a condition was even implied.[5] See Brown v. Perry, 184 F.3d 388, 393 (4th Cir.1999) (stating that quid pro quo claim can be established when acceptance of harassment is an “express or implied condition to the receipt of a job benefit”) (emphasis added).
However, that observation does not bar recovery. Instead, liability for discrimination on a quid pro quo theory can be established when “rejection of the harassment [is the] cause of a tangible job detriment.” Id. at 393; see also Burlington, 524 U.S at 753-54, 118 S.Ct. 2257 (“When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor’s sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII.”); 29 C.F.R. § 1604.11(a) (“Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when ... submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.... ”).
Okoli argued that she was fired for refusing Stewart’s advances. The City proffered non-discriminatory reasons for Okoli’s discharge which the majority appears to cast as mere pretext for discrimination. While we must view the evidence in the light most favorable to Okoli, I would allow a jury to decide whether the City’s reasons for Okoli’s termination were transparently false or facially illegitimate. Assuming arguendo that Okoli made a prima facie case for quid pro quo sexual harassment, I would hold that the City effectively rebutted the presumption of harassment created by the prima facie case. It bears mention that to effectively rebut the presumption, “[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant’s evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.” Texas Dep’t of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citation omitted). I would conclude that the City’s showing was sufficient to raise that issue of fact. However, because a jury could credit Okoli’s evidence indicating that the City’s proffered reasons were pretextual, I would conclude that it should be for the jury to determine whether the City’s nondiscriminatory reasons were the true motivation for Okoli’s termination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (establishing the burden shifting scheme which controls Title VII discrimination claims). Accordingly, I *229 would hold that the district court erred in granting summary judgment in favor of the City.
Okoli was hired on June 21, 2004, as an Assistant to the Executive Director of C.A.R.E., a position requiring her to provide “staff assistance and confidential secretarial and administrative support to the Executive Director.” J.A. 65. The job required her to, inter alia, maintain the Executive Director’s files and schedule as well as compose correspondence, reports, and memoranda for the Executive Director. She was expected to “deal with employees ... with tact and courtesy,” and “deal with confidential materials and situations with discretion.” J.A. 66. Okoli does not dispute that she was hired as an “at will” employee, meaning that she could be fired for “no reason or any reason at all-except an unlawful reason.” Smith v. Frye, 488 F.3d 263, 277 (4th Cir.2007) (Motz, J., concurring in part and concurring in the judgment).
There is also no dispute that the first few months of Okoli’s employment went well. However, according to Stewart’s affidavit, even as early as September 30, 2004, he had to counsel Okoli on the requirements of her position after she discussed confidential lay-offs with co-workers.[6] Stewart claims that even at the early stages of Okoli’s tenure he noticed clerical errors on outgoing correspondence for which Okoli was responsible.[7] In early January 2005, Stewart asserts that he gave Okoli an informal performance evaluation to indicate areas in which she needed improvement. Stewart claims that during the evaluation, he explained to Okoli that she needed to (1) correct persistent clerical errors in outgoing correspondence, (2) stop criticizing the work product of the Bureau Chiefs that worked under Stewart, (3) implement a filing system, (4) improve her time management skills, and (5) clean up her cluttered office. Stewart stated that after this performance review, Okoli became uncooperative and defiant while demonstrating no improvement in the areas of concern.
On January 24, 2005, Stewart “formally counseled [Okoli] about her performance.” J.A. 72. According to Stewart, he reiterated the need for her to improve her proofreading and typing. He advised her that he would consider disciplinary action, including termination, if she did not improve.
Stewart maintained that on February 14, 2005, he was preparing to distribute documents supposedly proofread by Okoli to the Baltimore City delegation to the Maryland General Assembly when he noticed that there were several errors in the documents. He claims he again spoke to Plaintiff regarding her performance.
According to Stewart, on March 1, 2005, Plaintiff left the office without telling him, although he later learned from C.A.R.E.’s receptionist that Plaintiff had gone to take her child to school. He instructed the receptionist to tell Plaintiff to see him immediately upon her return. Plaintiff received the message, but did not report immediately as instructed. Stewart claims he later confronted Plaintiff about being AWOL and told her that it constituted grounds for termination. According to Stewart, after this incident he spoke to the City’s Department of Human Resources about the possibility of terminating Okoli. *230 The record includes a letter drafted by Monica Wilson, a member of the City’s Department of Human Resources, confirming that Stewart came to her office to discuss Okoli’s unexcused absence. According to Wilson, “Stewart said that [Okoli] had not discussed [her anticipated absence from work] with him; that this was not the first incident of [Okoli] leaving the worksite for extended periods of time without his permission and that he had spoken to her about it prior to this date.” J.A. 153.
On March 23, 2005, Okoli demonstrated what Stewart saw as unacceptably insubordinate behavior. When Stewart arrived and asked her at 8:10 to assist in the preparation of documents for a meeting that morning, Okoli refused, stating that she would not assist him until 8:30. After returning from the meeting, Stewart asked Okoli to meet with him at 2:10. Okoli refused, stating that her lunch hour would not be over until 2:15. When Okoli finally met with Stewart, he informed her that her insubordination and “failure to improve her performance” constituted grounds for her termination.
Stewart avers that he had another of his employees draft a termination letter for Okoli later on March 23. He claims that it was his intention to terminate Okoli’s employment the next day. However, on March 24, Okoli took a day off. The next day was Good Friday, and Okoli had scheduled vacation for the following Monday through Wednesday. Okoli took a sick day on Thursday. Accordingly, the next day that she was in the office was April 1, 2005, the day when she was terminated.[8] Frank Johnson, the C.A.R.E. employee to whom Stewart delegated the task of drafting the termination letter, confirmed that it was initially drafted days before Okoli’s termination, although he couldn’t remember the exact date.[9]
In light of this evidence, I would hold that the City carried its burden of production by setting forth “ ‘through the introduction of admissible evidence,’ reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.” St. Mary’s Honor Center v. Hicks, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (quoting Burdine, 450 U.S. at 255, 101 S.Ct. 1089). The question then becomes whether Okoli presented sufficient evidence to indicate that the City’s proffered reasons for firing her were mere pretext. To avoid judgment as a matter of law on the question of whether an employer’s proffered reason was merely pretext and that opposition to sexual harassment was the real reason for her termination, Okoli must establish a “ ‘legally sufficient evidentiary *231 basis for a reasonable jury to find for [her].’ ” Hawkins v. PepsiCo, Inc., 203 F.3d 274, 278-79 (4th Cir.2000); see also Burdine, 450 U.S. at 256, 101 S.Ct. 1089 (stating that notwithstanding the burden shifting scheme, the plaintiff retains the “ultimate burden of persuading the [trier of fact] that [she] has been the victim of intentional discrimination”).
As summarized above, the City contended that Okoli was fired for her failure to correct repeated performance issues and for her increasing insubordination. The bulk of Okoli’s response is constituted of disagreement regarding the alleged deficiencies in her work performance. For instance, Okoli asserts that “in [her] nine months at CARE, there were no outgoing documents with even a single error.” J.A. 94. She also claims, regarding her absenteeism, that “Stewart advised [her] as early as [her] interview that [she] could work anytime that [she] wanted as long as [she] worked [her] allotted hours.” J.A. 96. Additionally, Okoli challenges the City’s assertion that Stewart addressed performance concerns with her prior to her termination.[10] Finally, Okoli’s allegations that she was repeatedly harassed are relevant to the contention that the City’s proffered reasons for her termination were pretextual. See McDonnell Douglas, 411 U.S. at 804, 93 S.Ct. 1817 (stating that “facts as to the [employer’s] treatment of [an employee] during his prior term of employment” can be relevant to a showing of pretext).
Okoli also generally opines that she performed well while employed at C.A.R.E. However, this merely indicates that she disagreed with her supervisor’s assessment of her performance. When considering whether an employee’s performance was the motivation for an adverse employment action, “ ‘[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.’ ” Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir.2000) (quoting DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir.1998)).
In sum, two competing stories were proffered about the City’s reason for firing Okoli, and there was evidence which, if proven at trial, would permit a jury to believe either story. “Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As such, I agree that Okoli’s claim for quid pro quo harassment should have survived the City’s motion for summary judgment.
III.
Title VII also makes it illegal “for an employer to discriminate against any of his employees ... because he opposed any practice made an unlawful employment practice by this title.... ” 42 U.S.C. § 2000e-3. As noted above, supra n. 9, I question whether a reasonable inference can be drawn from the evidence that the decision to terminate Okoli was made on *232 April 1. However, even assuming arguendo that the decision to fire her was made, as the City claims, on March 23, I would still hold that the district court erred in granting summary judgment for the City on Okoli’s retaliation claim.
To prove a prima facie case of retaliation, Okoli was required to demonstrate that “(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action.” Von Gunten v. Maryland, 243 F.3d 858, 863 (4th Cir.2001). As the majority observes, the April 1 letter to the Mayor was not the first attempt made by Okoli to use official channels to complain about Stewart’s actions. I agree that the undisputed fact that Okoli twice sent emails to City personnel complaining of “harassment” was sufficient to establish that she engaged in protected activity. Because she was subsequently fired, Okoli need only demonstrate that a causal connection existed between her opposition to Stewart’s actions and the decision to terminate her. As explained above, an unresolved factual dispute as to the reasons for Okoli’s termination made summary judgment for the City inappropriate.
IV.
In sum, I would hold that there is an unresolved factual dispute regarding the cause for Okoli’s termination. In other words, I cannot conclude as a matter of law that Okoli failed to demonstrate the requisite causal connection. As such, I agree with the majority that summary judgment in favor of the City was inappropriate.

. The Court was responding to Petitioner’s contention "that in prohibiting discrimination with respect to ‘compensation, terms, conditions, or privileges’ of employment, Congress was concerned with what petitioner describes as 'tangible loss’ of 'an economic character,’ not 'purely psychological aspects of the workplace environment.' ” Meritor, 477 U.S. at 64, 106 S.Ct. 2399.

. The distinction was drawn because, as the Burlington court recognized, it affected questions regarding an employer’s vicarious liability. When a supervisor takes a "tangible employment action" (defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits,” 524 U.S. at 761, 118 S.Ct. 2257) against an employee, vicarious liability for the employer is automatic. Id. at 762-63, 118 S.Ct. 2257. When no tangible employment action is taken, vicarious liabili *227 ty exists subject to a two-pronged affirmative defense. Id. at 765, 118 S.Ct. 2257 ("The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.”); see also Reinhold v. Com. of Va., 151 F.3d 172 (1998).

. I do not believe, however, that certain "gifts such as coats, lunch, and a holiday greeting card containing cash” given to Okoli contributed to the hostility of her work environment. Indeed, Okoli does not dispute that Stewart often took his employees to lunch for their birthday and gave his employees Christmas gifts, often of cash. Nor does Okoli dispute that, after Stewart’s mother died, he distributed a number of his mother’s personal belongings to the staff at C.A.R.E. He gave Okoli some used coats for her daughters as well a used bowling ball. Still, even without consideration of these gifts, the record indicates that Okoli subjectively perceived numerous sexual advances by Stewart as creating an abusive work environment, and I agree with the majority that Stewart’s alleged sexual harassment was "of the type that would interfere with a reasonable person's work performance ... to the extent required by Title VII.” Morgan v. Mass. Gen. Hosp., 901 F.2d 186, 193 (1st Cir.1990).

. Okoli did assert in her complaint that "Plaintiff was led to belief by Mr. Stewart that her employment opportunities would be enhanced if she accepted the sexual advances.” J.A. 10. (Citations herein to "J.A.-” refer to the contents of the Joint Appendix filed by the parties in this appeal.) However, she failed to point to a single instance in which Stewart expressly indicated any causal connection between her acceptance or rejection of his advances and any potential change to the conditions of her employment. In fact, Okoli herself indicated that when Stewart propositioned her he would say "Okay, but you know this doesn't mean you get any perks.” J.A. 107.

. It is of course difficult to state as a matter of law that a certain body of evidence fails to support an implication. However, the standard on summary judgment requires us to draw "all reasonable inferences” in favor of Okoli. See Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1129 (4th Cir.1987). Nothing in the record can be reasonably inferred to indicate that Stewart’s actions or comments impliedly conditioned Okoli’s job benefits on her acquiescence to his advances. Cf. Spencer, 894 F.2d at 659 (finding that prima facie quid pro quo claim was established where plaintiff produced evidence that a female coworker who succumbed to sexual demands of their employer received promotion but plaintiff refused sexual demands and was denied a promotion to a position that remained unfilled, thus evidencing, through implication, the existence of an impermissible condition).

. Okoli does not dispute that she disclosed this confidential information; instead she asserts that Stewart unfairly criticized her for the disclosure as retaliation for her opposition of his sexual advances.

. For instance, the record includes a number of emails sent by Okoli in early November 2004 which were returned because Plaintiff entered an incorrect email address.

. Okoli does not dispute that she was absent from the office from March 24 until April 1.

. There is arguably a question as to whether, when viewed in the light most favorable to Okoli, the evidence can support a reasonable inference that the decision to terminate her was made on March 23. However, in addition to the testimony of Johnson, who drafted Okoli's termination letter, and Stewart, who made the termination decision and ordered the letter drafted, the record includes the affidavit of Lisa Veale, who stated that Stewart “shared with me the desire to terminate Okoli due to her performance and attitude prior to her termination date.” J.A. 84. Admittedly, the fact "[t]hat a computer file was created on a certain day tells us nothing about its contents on that day.” However, the record also includes a “termination letter” dated March 24, 2005, indicating that Okoli's at will position would be terminated "effective March 28, 2005.” J.A. 184. I question whether, even viewing all the evidence in the light most favorable to Okoli, there can be, in light of the evidence presented by Defendants, a reasonable dispute regarding whether the decision to fire Okoli was made before or after Stewart gained knowledge of Okoli's letter to the May- or on April 1, 2005.

. Okoli asserts that "[Stewart] never told me to improve in any areas and thus, he never gave me any verbal or written documentation addressing performance, attitude or discipline.” J.A. 96. Curiously, however, the record includes Okoli’s handwritten notes from January 25, the date Stewart claims he conducted Okoli's formal evaluation. While those notes do not mention errors in documerits drafted by Okoli, they indicate that Stewart expressed displeasure with her unexcused and unannounced absence and stated that she could be terminated for failure to call to explain future absences. Moreover, Lisa Veale stated in her affidavit that she “sat in on a couple of meetings when [Stewart] spoke to Okoli about issues with her performance.” J.A. 82.