Charlene BROWN, Plaintiff,

v.

William J. HENDERSON, Postmaster General, United States Postal Service, Defendant.

No. CIV.A.1:99CV00798.

United States District Court, M.D. North Carolina.

Dec. 14, 2000.

---

W. Steven Allen, Greensboro, NC, for Charlene Brown, plaintiffs.

John W. Stone, Jr., Office of U.S. Attorney, Greensboro, NC, for Postmaster General, William J. Henderson, United States Postal Service, defendants.

## MEMORANDUM OPINION

BULLOCK, District Judge.

Plaintiff Charlene Brown ("Plaintiff" or "Brown") filed suit against Defendant William J. Henderson, Postmaster General of the United States Postal Service ("Defendant" or "the USPS") alleging sexual harassment and retaliation for reporting the alleged sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Defendant has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons summary judgment will be granted on both claims.

### FACTS

The following facts are established in the pleadings, affidavits, deposition testimony, and exhibits offered by the parties.[1] Where there are disputes, each party's position is given.

---

1. The court reminds the parties that Local Rule 7.3 limits briefs in support of motions and responsive briefs to a length of twenty pages.

A. *Allegations of Sexual Discrimination*

Brown, who is female, began working for the USPS in early 1996 as a mail processor at the Processing and Distribution Center ("P & DC") in Greensboro, North Carolina. Brown worked on Tour 3, which runs from 3:30 p.m. to midnight. She worked under the supervision of Cliff Hendrick ("Hendrick").

Brown alleges that just days after she started working for the USPS Hendrick began making inappropriate comments to her. She claims that he commented about her weight and appearance and that in one instance he made a comment indicating to her that he was jealous about other men at the P & DC speaking with her. Brown alleges that between March 1996 and February 1997 Hendrick continuously belittled her in front of other workers. She also claims that during that period Hendrick frequently made suggestive comments about her clothing. Defendant denies that Hendrick ever made disparaging or sexually suggestive comments to Brown.

On February 1, 1997, Hendrick allegedly called Brown to his work area and made sexually explicit comments to her. According to Brown, Hendrick suggested that they start a physical relationship. She also claims that Hendrick predicted that any physical relationship between them would last for only six months. Brown told her husband who also worked for the USPS about the incident when she returned home from work that night. They agreed that what had occurred was sexual harassment. Brown says she asked her husband not to say or do anything for fear that they might lose their jobs if they reported the alleged harassment. Neither Brown nor her husband reported the alleged comments to any management personnel. Once again, Defendant denies that Hendrick made any of the alleged comments to Brown.

Brown concedes that Hendrick did not make any comments of a sexual nature between February 2 and July 25, 1997. She claims, however, that he continued to belittle her any time she asked him work-related questions. In July 1997, Brown told the shop steward and the union president that Hendrick had been sexually harassing her. She specifically asked them not to report the allegations to management.

Brown claims that on July 25, 1997, Hendrick once again began making suggestive comments about her clothing. In particular, Brown asserts that Hendrick told her the outfit she wore that day looked good and that she should not "wear that back in here because that looks too good." (Brown Dep. at 63). Brown alleges that in December 1997, after bending down to operate one of the mail processing machines, Hendrick approached her and made an explicit and graphic statement about her physique. Defendant denies that Hendrick ever made these comments.

Brown further alleges that after Hendrick received his year-end bonus in December 1997, he offered her $600.00 if she would kiss him, and also made disparaging remarks of a sexual nature to her. Defendant responds that Hendrick never offered Brown any money to kiss him. In addition, Defendant states that Hendrick did not make the alleged sexually-oriented disparaging remarks to Brown.

Brown claims that on December 24, 1997, Hendrick kissed her on the lips and tried to put his tongue in her mouth. According to Brown, Hendrick's sexual advances were completely unwelcome and unreciprocated. Brown asserts that on January 16, 1998, Hendrick told her he wanted a better kiss. She claims that Hendrick grabbed her and attempted to kiss her, once again trying to put his

tongue into her mouth. Finally, Brown alleges that on January 22, 1998, Hendrick told her again that he wanted a better kiss. Defendant denies all of these allegations.

After the alleged January 22 incident, when Hendrick once again asked Brown for a better kiss, Brown reported to the Acting Manager of Distribution Operations, Dawn Ingram, that Hendrick had been sexually harassing her. Ingram immediately removed Brown from the work floor for the rest of the shift. Ingram also arranged for Brown to leave the building at the end of her shift through the back door so she would not have to pass through the workroom floor. According to Brown, as she left the building that evening Hendrick was waiting for her outside. She claims that he grabbed her and asked her what she had been discussing with Ingram. Hendrick then supposedly told Brown that "if you'll be patient, in six months I'll see about making you a [supervisor]." (Brown Dep. at 95). Brown interpreted Hendrick's statement to mean that if she would not bring sexual harassment charges against him, Hendrick would reward her with a promotion. (Brown Dep. at 96). Defendant denies that Hendrick grabbed Brown as she left the building and further denies that he made the offer of a promotion to her if she would "be patient."

## B. *Defendant's Response to Brown's Sexual Discrimination Allegations*

In response to Brown's allegations of sexual harassment, Defendant immediately and permanently removed her from Hendrick's supervision. Brown's days off were shifted so as not to coincide with Hendrick's. In addition, Brown and Hendrick were separated so that they no longer worked on the same floor. Brown was temporarily assigned to a new building which she said did not cause her any in-

convenience. Eventually, Brown was returned to her original building and Hendrick was reassigned to a new location. These measures succeeded in separating Brown and Hendrick. Brown had no further interaction with Hendrick after she reported his alleged sexual harassment to management.

In addition to separating Brown and Hendrick, the USPS conducted a formal investigation of Brown's allegations. Investigators interviewed Brown, Hendrick, and several other workers at the Greensboro P & DC. The investigation revealed conflicting accounts of what had occurred between Hendrick and Brown. As a result, no findings of sexual harassment were made. Even so, Hendrick was required to participate in sexual harassment training and the Greensboro P & DC facility stepped up its efforts to educate managers and employees about sexual harassment issues.

## C. *Defendant's Sexual Harassment Policy*

In addition to taking remedial measures, Defendant had preventive measures in place before Brown's allegations of sexual harassment. There were posters in three locations at the Greensboro P & DC facility notifying employees of procedures to follow if they experienced sexual harassment. One of the posters was located in the employee break area. Brown admits that she was aware of the poster in the employee break area and that she had also seen at least one of the other posters. (Brown Dep. at 159–60). These posters indicated that any claim of sexual discrimination must be brought within forty-five (45) days of the alleged incident. The posters also provided employees with the telephone number of an Equal Employment Opportunity ("EEO") Complaints Processing Specialist. This EEO Com-

plaints Processing Specialist was not in the same chain of command as the employees, managers, and supervisors at the Greensboro P & DC. Thus, individuals who believed they had been discriminated against were not required to report incidents to the alleged harasser or to any other person working at the P & DC.

D. *Allegations of Subsequent Retaliation*

Brown claims that after she reported the allegations of sex discrimination by Hendrick, other supervisors who were friends with Hendrick began to retaliate against her. She alleges that on three or four occasions Supervisor Emmett Degraffenreid disregarded seniority considerations and assigned her to the most difficult jobs on the work shift. In addition, Brown claims that on one occasion Degraffenreid gave her only a ten-minute break while all the other employees received a fifteen-minute break. Furthermore, Brown claims that Supervisor Brenda Morrison ordered another employee to measure the height of Brown's shoe heels. While Morrison states that this was done for safety reasons, Brown asserts that the real motivation behind measuring her shoe heels was to inconvenience her. Finally, Brown claims that she was retaliated against by Supervisor B.J. Thompson, who ordered the deactivation of Brown's badge, used to enter the facility, when Brown took an extended leave from work due to job stress. Brown filed formal administrative complaints with the EEOC for each of these incidents except the badge deactiva-

tion. She spoke with an EEO counselor about the badge deactivation incident, but abandoned the administrative process before filing a formal complaint.

DISCUSSION [2]

Summary judgment must be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party bears the burden of persuasion on the relevant issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party may survive a motion for summary judgment by producing "evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the motion is supported by affidavits, the non-moving party must set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see also Cray Communications, Inc. v. Novatel Computer Sys., Inc.,* 33 F.3d 390, 393–94 (4th Cir.1994) (moving party on summary judgment motion can simply argue the absence of evidence by which the non-movant can prove her case). In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which

---

**2.** Plaintiff's complaint alleges sex discrimination in violation of Title VII but does not set forth any specific causes of action. The complaint mentions sexual harassment, a hostile work environment, and retaliation. Because of the facts presented and because it is not mentioned in any complaint or pleading, the court assumes that the Plaintiff is not asserting a claim of *quid pro quo* sex discrimination. Plaintiff does not identify any carried-

out threats that would support such a claim. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 751, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("Cases based on threats which are carried out are referred to often as *quid pro quo* cases, as distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment.").

the [fact finder] could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505.

## A. *Hostile Work Environment Claim*

▮▮ Title VII makes it an "unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). To state a claim for a hostile work environment, a plaintiff must show that: (1) the harassment was unwelcome; (2) the harassment was based on sex; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *See Causey v. Balog,* 162 F.3d 795, 801 (4th Cir.1998). At issue in this case is whether the alleged discriminatory conduct was sufficiently severe or pervasive to bring it within Title VII's purview. To make this determination, the court must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Courts have often found that even boorish and offensive behavior does not rise to the level of "severe or pervasive" conduct and therefore does not support a hostile work environment claim. *See Hartsell v. Duplex Prods., Inc.,* 123 F.3d 766, 773 (4th Cir.1997) (gender-based statements to a female employee, including "go home and fetch [your] husband's slippers like a good little wife," did not amount to severe or pervasive conduct); *Boarman v. Sullivan,* 769 F.Supp. 904, 910 (D.Md.1991) (no hos-

tile work environment created by a supervisor criticizing complainant's plan as stupid and asking her in a closed office to remove all her clothing). But when the alleged discrimination includes physical touching the courts have been more reluctant to grant summary judgment. *See Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 430–31 (7th Cir.1995) (explaining the distinction between cases in which summary judgment is denied and those where it is granted by stating that, "[o]n one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers") (citations omitted); *see also Curde v. Xytel Corp.,* 912 F.Supp. 335, 341 n. 8 (N.D.Ill.1995) (existence of physical contact between co-workers as well as threatening nature of co-workers' remarks may establish a hostile work environment); *Shaw v. Mellon Bank, N.A.,* 69 F.E.P. 550, 553 (W.D.Pa.1995) (allegations that supervisor touched plaintiff on more than one occasion found to go beyond mere isolated incidents of vulgarity and crude banter and were held to create an issue of genuine material fact). Even in cases alleging physical contact, however, courts have sometimes dismissed hostile work environment claims. *See, e.g., Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 534 (7th Cir.1993) (no hostile work environment found where supervisor kissed plaintiff and rubbed her thigh); *Gearhart v. Eye Care Ctrs. of Am., Inc.,* 888 F.Supp. 814, 824–25 (S.D.Tex.1995) (conduct that included numerous sexual comments and one inappropriate touching did not rise to level of actionable claim for hostile work environment sexual harassment).

As demonstrated by these cases, the line between severe or pervasive behavior and conduct that is merely offensive but not actionable is often a difficult one to draw. In this case, where the pertinent allegations of discrimination within the statutory period include a supervisor: (1) attempting to kiss the plaintiff and put his tongue in her mouth; (2) twice stating that he "wanted a better kiss"; and (3) using a potentially threatening situation to try to convince the plaintiff not to report sexual harassment, the court hesitates to declare as a matter of law that the allegations do not rise to the level of severe or pervasive harassment. Accordingly, whether the "harassment was sufficiently severe or pervasive to create a hostile work environment is quintessentially a question of fact" for the jury. *Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir.1989). Consequently, the court will not grant summary judgment on the basis that Plaintiff has failed to allege sufficiently severe or pervasive conduct.

## B. *The Continuing Violation Doctrine*

Defendant claims that Brown failed to seek timely administrative redress for all alleged incidents other than those of January 16 and January 22, 1998. Defendant argues that as a consequence of Brown's untimeliness, only the incidents on these two dates should be considered in determining whether a hostile work environment existed. Brown counters that all of the alleged incidents comprise a single continuing violation, and therefore none of her allegations should be time-barred.

As a federal employee Brown was required to exhaust her administrative remedies before bringing a claim for discrimination in district court. *See Long v. Ringling Bros.-Barnum & Bailey Combined Shows, Inc.*, 9 F.3d 340, 343 (4th Cir.1993) (citing *Brown v. General Servs.*

*Admin.*, 425 U.S. 820, 832, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976)); *see also* 42 U.S.C. § 2000e–16(c). The administrative process required that Brown contact an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1). Although Brown contends that she was the victim of discriminatory conduct from early 1996 until January 22, 1998, she did not contact an EEO counselor about any of the alleged acts until March 2, 1998. Therefore, barring an exception to the forty-five (45) day contact requirement, only the January 16 and January 22, 1998, incidents should be considered in determining whether a hostile work environment existed.

■ The Fourth Circuit has stated that in examining a Title VII discrimination claim "[i]ncidents outside of the statutory window are time-barred unless they can be related to a timely incident as a 'series of separate but related acts' amounting to a continuing violation." *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir.1997) (citing *Jenkins v. Home Ins. Co.*, 635 F.2d 310, 312 (4th Cir.1980) (per curiam)). The continuing violation doctrine allows events that occurred outside the statutory time limit to remain actionable as long as those events can be linked to at least one discriminatory act that was brought forth in a timely fashion. *See Hill v. AT & T Techs., Inc.*, 731 F.2d 175, 180 (4th Cir.1984) (stating that for the continuing violation doctrine to apply there must be a "present violation" within the required time period).

The Fourth Circuit has not yet established a specific test to determine what constitutes a continuing violation, and other circuits have split on the issue. *Compare Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164 (7th Cir. 1996) (continuing violation doctrine does not apply unless it would have been unreasonable to expect the plaintiff to sue earli-

er) and *Berry v. Board of Supervisors of L.S.U.,* 715 F.2d 971 (5th Cir.1983) (creating a three-factor test including whether the harassing act should trigger an employee's awareness of and duty to assert her rights) *with Morgan v. National R.R. Passenger Corp.,* 232 F.3d 1008 (9th Cir. 2000) (plaintiff can establish a continuing violation by showing a series of related acts or systemic violations involving a company-wide policy or practice). It is not necessary for this court to choose between these varying approaches to determine whether a continuing violation occurred in this case because, as discussed below, Plaintiff unreasonably failed to take advantage of corrective opportunities provided by the Defendant despite recognition of Hendrick's discriminatory acts.

### C. *Affirmative Defense to Hostile Work Environment Claim*

Defendant argues that even if Plaintiff's allegations rise to the level of severe or pervasive conduct, the hostile work environment claim still fails under the affirmative defense established in *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In these companion cases, the Supreme Court held that when no "tangible employment action" is taken, a defending employer may raise an affirmative defense by showing "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer." *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257, *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275.

In the instant case, Plaintiff suffered no "tangible employment action" related to the alleged harassment by her supervisor. The Supreme Court defined a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257. Plaintiff contends that a temporary pay reduction for three months in early 1999 amounts to a tangible employment action and prevents Defendant from invoking the affirmative defense. While it is uncontested that Plaintiff did receive reduced pay from January to March 1999, this employment action bore no relation to the hostile work environment allegedly created by Plaintiff's supervisor and therefore has no effect on the applicability of the affirmative defense.

Plaintiff's temporary pay reduction occurred almost one year after she reported the allegations of discrimination by Hendrick to postal management. Hendrick's supervision of Plaintiff ceased immediately upon her allegations of harassment. After reporting the alleged harassment, Plaintiff and Hendrick were completely separated from one another. Plaintiff saw Hendrick on only one occasion after making her complaint, and they had no communication with one another in any way. Hendrick played no part in Plaintiff's temporary pay reduction in early 1999. The Supreme Court said in *Ellerth* that "[t]angible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Ellerth,* 524 U.S. at 762, 118 S.Ct. 2257. Hendrick never took tangible employment action against Plaintiff. Hendrick's clear lack of involvement in Plaintiff's salary reduction and the lengthy time between his alleged misconduct and Plaintiff's salary reduction belies any relationship between the reduction and Plaintiff's hostile

work environment claim. Consequently, Defendant may seek to assert the affirmative defense established in *Ellerth* and *Faragher*.

 Defendant must show by a preponderance of the evidence that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" for the affirmative defense to apply. *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. One factor in preventing and correcting sexual harassment is the adoption of an anti-harassment policy. *See Smith v. First Un. Nat'l Bank*, 202 F.3d 234, 244 (4th Cir.2000) ("An employer's adoption of an effective anti-harassment policy is an important factor in determining whether it exercised reasonable care to prevent any sexually harassing behavior"). "[A]ny [anti-harassment] policy adopted by the employer must be both reasonably designed and reasonably effectual." *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir.1999). Defendant had such a policy. The policy, adopted in 1987 and in effect during the entire time of the alleged harassment, states in part that "[s]exual harassment in any one of its several forms is improper and unlawful conduct, and the Postal Service will not tolerate its presence in the workplace." The policy also states that "employees who believe that they are the victims of sexual harassment may seek relief through the Equal Employment Opportunity complaint process," thus ensuring that employees would not have to report allegations of harassment to anyone working at the Greensboro P & DC.

Since 1987 the sexual harassment policy has been posted in three locations at the Greensboro P & DC facility, including on the official facility bulletin board and in the employee break area. Posted in the three locations along with the sexual harassment policy was a poster entitled "Equal Employment Opportunity is the Law; Discrimination is Prohibited." This poster details the EEO complaint procedure, notifies employees that they must present claims to an EEO counselor within forty-five (45) days of the alleged incident, and provides contact information for a senior EEO Complaints Processing Specialist. Plaintiff admits that she saw at least two of these postings during the time of alleged harassment, so there is no material issue about whether the sexual harassment policy was adequately disseminated at the P & DC. Through its anti-harassment policy, Defendant sought to prevent and correct sexually harassing behavior. No evidence indicates "that [the] employer adopted or administered [the] anti-harassment policy in bad faith or that the policy was otherwise defective or dysfunctional." *Brown*, 184 F.3d at 396.

 Despite the reasonable care taken by Defendant to prevent and correct promptly any sexually harassing behavior, Plaintiff initially "unreasonably failed to take advantage of [the] preventive or corrective opportunities" that Defendant provided. *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275.

> [W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. Plaintiff admits that she knew by February 1, 1997, that she was being harassed. She also admits that she saw multiple anti-harassment postings around the workplace which instructed employees how to report sexual harassment. Even so, Plaintiff

failed to report the alleged sexual harassment until January 22, 1998. Plaintiff explained her failure to use the anti-harassment procedures by stating that she feared retaliation against her or against her husband if she reported the alleged harassment. These unspecified fears of retaliation do not make Plaintiff's failure to report reasonable. "[C]ourts have drawn some outer boundaries by holding that failing to utilize complaint procedures because of generalized retaliation concerns is not reasonable in light of the overall purposes of Title VII." *Barrett v. Applied Radiant Energy Corp.*, 70 F.Supp.2d 644, 651–52 (W.D.Va.1999). Plaintiff has provided no evidence that employees who had previously reported problems with their supervisors faced retaliation in any way. As a result, even if the earlier incidents of harassment are not time-barred, Plaintiff acted unreasonably in failing to use Defendant's anti-harassment policy to report them. Subsequent harassment by Plaintiff may have been avoided had she promptly reported earlier incidents.

■ Finally, Defendant acted promptly and effectively to prevent the recurrence of harassment once Plaintiff reported Hendrick's alleged misconduct. Defendant first received notice of Hendrick's purported harassing behavior on January 22, 1998, when Plaintiff spoke with supervisor Dawn Ingram. Prior to this, Defendant had no notice of any improper behavior on Hendrick's part. Plaintiff's allegations were immediately reported to upper management and investigated. Although the eventual conclusion of this internal investigation led to a determination that no sexual harassment had occurred, Hendrick was required to attend sexual harassment counseling. Hendrick was also immediately removed from his supervisory role over Plaintiff, and Plaintiff had no more interaction with him. The remedial steps taken by Defendant completely and effectively ended any harassment by Hendrick.

*Ellerth* and *Faragher*, while reaffirming the Court's previous rejection of automatic liability for sexual harassment by supervisors, did not directly address a situation in which an employer takes prompt and effective remedial action upon an employee's invocation of the employer's anti-harassment policy. As a panel of the Fourth Circuit has said,

> [W]e cannot conceive that an employer that satisfies the first element of the affirmative defense and that promptly and adequately responds to a reported incident of sexual harassment . . . would be held liable for the harassment on the basis of an inability to satisfy the literal terms of the second element of the affirmative defense.

*Watkins v. Professional Sec. Bureau, Ltd.*, No. 98–2555, 1999 WL 1032614, at *5 n. 16 (4th Cir. Nov.15, 1999) (unpublished). *Accord Indest v. Freeman Decorating, Inc.*, 164 F.3d 258 (5th Cir.1999) (holding that, because the employer promptly and effectively responded to the plaintiff's prompt complaint, vicarious liability was inappropriate); *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1369 (11th Cir.1999) (Barkett, J., concurring specially) ("Under the framework established by the Court in *Faragher* and *Burlington Industries*, a prompt response by an authorized agent to halt reported harassment is sufficient to relieve the employer of liability under Title VII in cases where the harassment has not culminated in [a tangible employment action].").

The Supreme Court said in *Faragher* that its decision was built on the foundation that "Title VII does not make employers 'always automatically liable for sexual harassment by their supervisors.'" *Faragher*, 524 U.S. at 792, 118 S.Ct. 2275 (citing *Meritor Sav. Bank, FSB v. Vinson,*

477 U.S. 57, 69–70, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). However, under the literal terms of the *Ellerth/Faragher* affirmative defense, an employer who has an anti-harassment policy in place and who acts promptly to correct misconduct in the workplace will face liability if the employee reports the misconduct immediately, but will avoid liability if the employee delays in reporting it, even though the misconduct is the same and the employer ultimately makes the same effective response. Thus, focusing on the preventive measures an employer has in place and the remedial action taken by the employer once it is notified of a problem avoids a determination of liability based simply on when the employee reports the harassment.

In this case, Plaintiff failed to take advantage of corrective procedures provided by Defendant. Once Plaintiff reported the alleged harassment, Defendant promptly corrected the situation. For these reasons, Defendant's summary judgment motion on Plaintiff's hostile work environment claim will be granted.

**D.** *Retaliation Claim*

 Title VII states that, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge ... or participated in any manner in an investigation, proceeding, or hearing under this [title]." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation Plaintiff must show by a preponderance of evidence that: (1) she engaged in protected activity; (2) her employer took adverse action against her; and (3) a sufficient causal connection existed between her protected activity and her employer's adverse action. *See Munday v. Waste Mgmt. of N. Am., Inc.,* 126 F.3d 239, 242 (4th Cir.1997). The employer can rebut the *prima facie* case by showing that there

was a legitimate, non-discriminatory reason for the adverse action. The burden then shifts back to the plaintiff to show that this reason is pretextual. *Carter v. Ball,* 33 F.3d 450, 460 (4th Cir.1994).

Not every employment decision that displeases an employee constitutes an adverse employment action for the purposes of Title VII. As the Fourth Circuit has stated, adverse employment actions typically concern "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.1981); *see also Dollis v. Rubin,* 77 F.3d 777, 781–82 (5th Cir.1995) (stating "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon the ultimate decisions").

 Most of Plaintiff's allegations of retaliation concern inconveniences in the workplace rather than ultimate employment decisions and do not constitute adverse employment actions. She alleges that on three or four occasions a supervisor disregarded seniority protocol in assigning her work tasks. In addition, Plaintiff claims that on one occasion she was given a five-minute shorter break than her co-workers. Plaintiff also claims that supervisors measured the height of the heels of her shoes on one occasion in an effort to annoy her. At most these allegations amount to bothersome inconveniences. They do not rise to the level of adverse employment actions, and are insufficient to support a retaliation claim under Title VII.

 The only incident of alleged retaliation that potentially reaches the level of an adverse employment action is Plaintiff's temporary pay reduction during the first few months of 1999. In November 1998, a supervisor deactivated Plaintiff's badge

while she was out on extended sick leave. Plaintiff claims that the decision to deactivate the badge was made with a retaliatory motive and that the deactivation ultimately led to a temporary reduction in her salary. Plaintiff fails, however, to demonstrate adequately the causal connection between her protected activity and the temporary reduction in pay. Consequently, this claim of retaliation also fails.

When Plaintiff started working at the Greensboro P & DC in March 1996, her job was classified as a Level 4 position. In 1998, after Plaintiff had filed a formal EEO sexual harassment complaint against Hendrick, she bid on and received a promotion to a Level 5 position. Plaintiff earned higher pay in this Level 5 position. In November 1998, Plaintiff's Level 5 position was eliminated due to downsizing, and she returned to her original Level 4 position. Plaintiff still retained a Level 5 salary, though. Under workplace policy, as long as Plaintiff bid on every Level 5 position that became available she maintained Level 5 benefits, notwithstanding the fact that she was performing a Level 4 job.

After returning to her Level 4 position in November 1998, Plaintiff presented a doctor's note to Defendant stating that she needed a four-week leave of absence because of job-related stress. During this extended leave Defendant deactivated Plaintiff's badge, thus not allowing her to enter the P & DC facility. Plaintiff claims that the decision to deactivate her badge was not standard procedure and was done in retaliation for bringing sexual harassment charges against Hendrick.[3] Plaintiff further argues that her inability to enter the P & DC facility prevented her from being aware of and bidding on open Level 5 positions and led to a temporary loss of Level 5 status, which in turn resulted in a temporary reduction in salary.[4]

Defendant counters that the temporary loss of Level 5 status was not due to any discriminatory act but instead resulted from Plaintiff's failure to apply for an open Level 5 position, as she had been notified she needed to do. On December 15, 1998, while Plaintiff was out on extended leave, Defendant mailed to Plaintiff a "Notification of Personnel Action." This form notified Plaintiff that she would retain Level 5 status as long as she continued to apply for open Level 5 positions.

Plaintiff explained her failure to apply for Level 5 positions by stating, "I really didn't know that bidding was even going on because I was told ... that they didn't do bidding in the month of December." (Brown Dep. at 126). Plaintiff does not disclose where she heard that there was a suspension of bidding during December, and she does not deny receiving the Notification of Personnel Action.

Plaintiff's argument is too tenuous to support a retaliation claim. To successfully state a retaliation claim, Plaintiff must

**3.** Defendant presents affidavit testimony from Manager of Distribution Operations Thomas L. Smith stating that because the note from Plaintiff's doctor ordered that Plaintiff remain out of work for four weeks the decision to deactivate the badge was proper and not discriminatory in any way. Smith cites Postal policy contained in Handbook EL–311, Section 342, to support this position. According to Section 342, when an employee is absent for more than twenty-one days for any reason, including stress, she must submit a doctor's note to the Postal nurse prior to returning to work. Plaintiff argues that she did not need a doctor's note to re-enter the workplace, but offers no objective evidence in support this position.

**4.** Plaintiff received Level 4 salary between January 1999 and March 1999 because of her failure to bid on open Level 5 positions. She resumed Level 5 status in March 1999, by bidding for an open Level 5 job.

show a causal connection between her protected activity and an adverse employment decision made by Defendant. There is no objective evidence that Defendant acted improperly in deactivating Plaintiff's badge or that this decision was motivated by retaliatory animus. Furthermore, Plaintiff's inadequate explanation for failing to apply for open Level 5 positions, even after receiving written notification of the necessity to do so, severs any potential causal connection between her protected activity and her temporary pay reduction. Consequently, the court will grant summary judgment to Defendant with respect to the retaliation component of Plaintiff's Title VII claim.

## CONCLUSION

For the foregoing reasons the court will grant Defendant's motion for summary judgment on all of Plaintiff's claims.

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

### ORDER and JUDGMENT

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendant's motion for summary judgment [Doc. # 17] is **GRANTED**, and this action is **DISMISSED** with prejudice.